**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

PATRICK H. CROMER,
Plaintiff-Appellant,

v.

JOHNNY MACK BROWN, individually
and in his official capacity as
Greenville County Sheriff;

GREENVILLE COUNTY SHERIFF'S
OFFICE,
Defendants-Appellees.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
Amicus Curiae.

No. 94-1403

Appeal from the United States District Court
for the District of South Carolina, at Greenville.
Henry M. Herlong, District Judge.
(CA-92-3555-6-20-AK)

Argued: December 7, 1994

Decided: July 15, 1996

Before RUSSELL and MICHAEL, Circuit Judges, and MESSITTE,
United States District Judge for the District of Maryland, sitting by
designation.

_____


Affirmed in part, reversed in part, and remanded by published opin-
ion. Judge Michael wrote the opinion, in which Judge Russell and
Judge Messitte joined.

_____

**COUNSEL**

**ARGUED:** Stephen John Henry, TAYLOR & HENRY, Greenville, South Carolina, for Appellant. Anna Maria Conner, HAYNSWORTH, BALDWIN, JOHNSON & GREAVES, P.A., Greenville, South Carolina, for Appellees. **ON BRIEF:** Thomas A. Bright, HAYNSWORTH, BALDWIN, JOHNSON & GREAVES, P.A., Greenville, South Carolina, for Appellees. James R. Neely, Jr., Deputy General Counsel, Gwendolyn Young Reams, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, Robert J. Gregory, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

_____

**OPINION**

MICHAEL, Circuit Judge:

Patrick Cromer, an African American who sued his former employer (Johnny Mack Brown, the Sheriff of Greenville County, South Carolina) for racial discrimination and First Amendment violations, appeals from the grant of summary judgment to the sheriff on some claims and the dismissal of others. We affirm in part, reverse in part, and remand for further proceedings.

First, Cromer claims that because of his race Sheriff Brown demoted him from captain to lieutenant, and then fired him from his job as lieutenant, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. The district court held that Cromer was not protected under Title VII because (as both captain and lieutenant) he fit within the statute's exclusion for the "personal staff" of an elected official. We affirm the district court on the captaincy exclusion, but we reverse on the lieutenancy. We hold that Cromer was not on Sheriff Brown's personal staff when he was a lieutenant, so the Title VII claim is remanded insofar as it charges that Cromer was fired from his job as lieutenant because of race.

Second, Cromer claims that he was demoted and discharged because of his race in violation of the Civil Rights Act of 1991, 42

2

U.S.C. § 1981. Sheriff Brown took these actions before the effective date of the amendments to § 1981, and the district court dismissed the § 1981 claims on the ground that the Civil Rights Act of 1991 is not applied retroactively. We summarily affirm the dismissal of these claims. See Rivers v. Roadway Express, Inc., 114 S. Ct. 1510, 1513 (1994) (the Civil Rights Act of 1991 does not apply retroactively to cover conduct completed prior to the law's enactment).

Third, invoking 42 U.S.C. § 1983, Cromer claims that Sheriff Brown fired him from his job as lieutenant in violation of his First Amendment rights of free speech and association because Cromer joined a black officers' association and spoke up about perceived racial discrimination in the sheriff's office. On these claims, the district court granted summary judgment to Sheriff Brown in his individual capacity, holding that the sheriff was entitled to qualified immunity. We disagree and reverse on this point. Cromer had a clearly established right (of which a reasonable official would have known) to speak up about the widespread perception of racial discrimination in the sheriff's department and to join an association of black officers formed to bring complaints of discrimination to the sheriff's attention. To the extent the § 1983 claims were against Sheriff Brown in his official capacity, we affirm the district court's holding that the sheriff, as a state official, is immune from suit for money damages. We reverse the district court's determination that the doctrine of official immunity protects the sheriff from claims for injunctive relief.

I.

A.

The facts about Cromer's different roles as captain and lieutenant are not in dispute. We construe the other facts in the light most favorable to Cromer, the non-moving party below. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

Sheriff Brown's predecessor in office hired Cromer to work as a deputy sheriff in 1974. In 1976 Brown was elected sheriff. Upon taking office in January 1977, Brown recommissioned Cromer as a deputy. Within the next two weeks Sheriff Brown promoted Cromer

twice, first to sergeant and then to lieutenant. Cromer served as a lieutenant from 1977 until 1988.

During the twelve-year period from 1977 to 1988, Sheriff Brown denied Cromer a promotion to captain several times. According to Cromer, Sheriff Brown refused to promote him because of Cromer's long-term relationship with a white woman, Beth Johnson. Specifically, Cromer testified (in deposition) as follows:

> Question: [When you asked Sheriff Brown about promotion to captain], [w]hat did he say?
>
> Cromer: At that time, I was dating a white female and he told me that he would have a serious problem with me being a captain for him, since I was dating that white girl. . . .
>
> Question: All right. Tell me about that conversation. When did this take place? . . .
>
> Cromer: That conversation ha[s] taken place many times with myself and Sheriff Brown over the years.

\* \* \*

> Question: I want to know [about each one of the conversations] to the best of your recollection.
>
> Cromer: All I'm telling you, we had many conversations concerning Beth and he made it good and clear that he didn't appreciate interracial dating. He didn't like it and he wasn't tolerated [sic] for it and he just couldn't handle it and he made it good and plain to me. And many times, he threatened to terminate me . . . .

The sheriff also let Cromer know that he should not bring Beth to the Annual Sheriff's Office Awards Banquet. This led Lieutenant Cromer to tell his immediate supervisor, Captain Sorrow, that "I would not be attending those awards if I couldn't bring Beth."

4

In 1988 Major Barnett, the officer of highest rank under Sheriff Brown, suggested to the sheriff that he promote Cromer to captain. Major Barnett later told Cromer "that the Sheriff had reservations, but he [Barnett] was standing tall to try to get me promoted because he felt like I was qualified and it was about time." In June 1988 Cromer again talked with the sheriff about the possibility of a promotion. Again, Beth, Cromer's white companion, was a subject of discussion. However, on July 1, 1988, Sheriff Brown made Cromer the first black captain in the history of the Greenville County Sheriff's Office.

As one of four captains, Cromer stood high in the chain of command in the sheriff's office. He commanded one of four divisions, Uniform Patrol, and supervised 185 officers, including five lieutenants and twenty-six sergeants. Cromer was outranked only by Major Barnett and Sheriff Brown. Together, the four captains, the major and the sheriff made up the "command staff." The command staff met weekly to discuss operations, policy and procedure. Cromer felt he had a "strong, effective voice" in policy discussions when he was captain. The command staff was also responsible for community relations. Once, while Cromer was captain, the command staff met with the president of the Greenville County NAACP. Cromer told the president, "I [am] the Captain of Uniform Patrol and . . . black, if there [are] racial problems [in the sheriff's office], they [are] brought directly to me and we [will] handle them."

Cromer's tenure as captain did not go smoothly. Cromer apparently believes that certain white lieutenants orchestrated a campaign to have him ousted as captain. Sheriff Brown says that certain lieutenants did begin to question Cromer's methods of supervision and that Major Barnett investigated the complaints by interviewing the complaining lieutenants and several sergeants. Barnett then reported to Brown, who demoted Cromer from captain to lieutenant on March 13, 1991. Sheriff Brown asserts that he demoted Cromer because he had "lost his ability and his effectiveness as a commander of the uniform patrol." According to the sheriff, Cromer lost his effectiveness because he supervised through fear and retaliation. Cromer claims his demotion was because of his race. He was treated differently, he says, than any white captain whose performance was ever questioned.

5

White captains with performance problems had simply been reassigned to other duties without taking a demotion in rank.**1**

As a lieutenant Cromer no longer participated in command staff meetings. He rarely saw Sheriff Brown. Cromer's only formal contact with the sheriff occurred at monthly meetings, which were attended by every officer in the department. As a lieutenant Cromer was neither involved in creating department policy nor consulted on any proposed changes to policy.

On May 1, 1991, six weeks after Cromer's demotion, most (about 30) of the sheriff department's 32 black deputies met after work at a private residence. There, under the leadership of Sergeant Paul Guy, they formed a group called the Black Law Enforcement Officers Association (the "Association"). Cromer attended the Association's first four meetings. Each meeting was held after work at a private residence. At the Association's meetings the black officers discussed their concerns about racial problems in the sheriff's department. After the fourth meeting, in mid-May, 1991, the Association submitted privately to Sheriff Brown an unsigned letter entitled"Race Relationship Within The Greenville County Sheriffs Office As Perceived By Black Deputies."**2**

The seven-page letter began by saying that "Black officers within the [Greenville County Sheriff's Office] have formed a committee to discuss the racial climate within the Sheriff's Office." The letter's introduction explained that the black officers had come to a "consensus" that the command staff and certain unwritten policies in the department were "inhibit[ing] the advancement of Black officers." "It is also the consensus among Black officers," the letter continued, "that supervisors are attempting to target, categorize, and defame Black officers who exhibit any form of leadership qualities." The letter's introduction ended with the complaint "that the overall white structure" in the sheriff's office had little or no understanding of "the

_____

**1** As we indicate in other parts of this opinion, we are affirming the judgment in favor of Sheriff Brown as to all of Cromer's claims for discriminatory demotion.

**2** Apparently the letter was slipped under Sheriff Brown's door while he was out of the office.

6

Black ethos," which led "to a High level of insensitivity toward Black officers. This insensitivity is both destructive and dangerous in regards to . . . the overall effectiveness of the[sheriff's office] as a Law Enforcement Agency."

Next in the letter the black officers discussed several areas where they believed blacks were receiving unequal treatment. These included minority recruitment, cross-training and transfers, promotion, make-up of the Office of Professional Standards (internal affairs), off-duty jobs and equipment.

As to recruitment, the Association said that the department's recruitment officer "lack[ed] the needed expertise in minority recruitment." Recruiters projected an image of the department that "discourage[d] Black applicants."

As to cross-training and transfers, the Association said:

> It is felt that [white] supervisors have deliberately limited Black officer's growth by not advancing qualified Black officers. This is transmitted by White supervisors recommending White officers for cross training in certain areas within CID such as, white collar crime section, housebreaking section, school district and major crime section. White supervisors within these divisions have made their position known to supervisors in uniform patrol as to whom they want and do <u>not</u> want. Therefore, many officers <u>never</u> have the opportunity to display their abilities.

The letter charged that the supervisors of two prestigious units, white collar and major crimes, had "made a conscious effort" to keep "their sections exclusively White."

Lack of promotional opportunities for blacks was a theme that appeared throughout the letter. Major Barnett was criticized for recent newspaper comments that, according to the Association, "le[ft] the reader with the opinion that there are no Black officers with the capabilities and qualifications to be promoted." Black officers were discouraged and many felt that "favoritism is shown toward White

7

officers with less education and less job experience. Black officers are beginning to lose faith in the promotional process." Specifically, the Association charged that promotional boards were biased against black officers, particularly because the boards did not exercise appropriate independence.

The Association asserted that the Office of Professional Standards (internal affairs), which was staffed by white officers, conducted internal investigations in ways that "pit White officers against Black officers." The Association suggested the assignment of a black officer to internal affairs.

As to off-duty jobs, the Association charged that the highest paying jobs (apparently those in retail stores) went to white officers. As to equipment, the group complained that "White officers get the first choice in new equipment." Finally, the black officers believed there was a need for a black negotiator on the SWAT team.

Sheriff Brown was quite upset by the letter, and he blamed Cromer. "I suspected Cromer," the sheriff testified, "because of his reduction in rank. In the past 15 to 17 years prior to this, there was never any hint of discontent, never. No rumors, nothing. I concluded it had to have started after Cromer was demoted. Something like this does not happen overnight."

Sheriff Brown admitted that he was very angry at Cromer for not coming to his (the sheriff's) defense. The sheriff said he was not angry because Cromer had gone to the meetings of the Association. Rather, the sheriff said, he was angry "[b]ecause [Cromer], above anybody else, should have known that none of these complaints were legitimate." According to the sheriff, Cromer should have known the complaints were not true because Cromer before his demotion sat on promotion and interview boards and participated in command staff meetings where policy was made. The sheriff therefore believed that Cromer could have answered all of the complaints at the Association meetings, providing a full defense for the sheriff.

On May 22, 1991, Sheriff Brown sent each black officer a six-page response to the Association's letter. The sheriff opened his response by explaining that "I have personally worked to create a personnel

8

process that is colorblind, and emphasizes merit over personalities." The sheriff denied each of the charges, but he nevertheless expressed a willingness to work hard to cure any perception that race played a role in the operations of his office.

In his written response Sheriff Brown placed much of the blame for any problems at the feet of a "black Captain, who was a member of the command staff until recently." The sheriff was referring to Cromer. He said that Cromer never complained that black officers were being discriminated against in assignment and promotion. According to the sheriff, in a meeting between the command staff and the president of the Greenville County NAACP, Cromer assured the president that "we had no racial problems in the Sheriff's Office." The sheriff said that Cromer had congratulated the department's recruiter for outstanding minority hires. Finally, the sheriff said that because Cromer had recently been in charge of Uniform Patrol, any failure to transfer black officers out of Uniform Patrol into more prestigious units "would have had . . . [Cromer's] support and endorsement." In short, the sheriff blamed Cromer for his troubles.

Sheriff Brown closed his letter to the black officers as follows:

> I have reviewed all of the above complaints and tried to respond to them. I am deeply disturbed that such serious complaints exist. If they are factually documented, I will take strong action to eliminate them. It appears that most of the complaints dealing with employment and promotions are not justified by the facts. . . . However, I am equally concerned with even the perception of racial division. . . . Even though we have a chain of command, my door is always open for any officer to bring up complaints of such a serious nature.

Sheriff Brown ended with this warning: "I will . . . not tolerate any individual of any race using racial issues to pursue personal vendettas."

On May 27, 1991, five days after Sheriff Brown's letter to the black officers, Sergeant Rodney Watts, a member of the black officers' Association, wrote to the sheriff. Watts reported that Lieutenant

9

Kelley had claimed that Sheriff Brown made a racist remark about Watts while talking with Kelley at the awards banquet about two months earlier. Sergeant Watts requested a meeting with the sheriff. Upon getting the letter, the sheriff called Watts to his office. According to Watts, when he walked in, Sheriff Brown "slammed that door behind me, and he said `I can't believe you have the [expletive deleted] audacity to send me this letter.' . . .`Pat Cromer put you up to this, didn't he?'" Later in the meeting the sheriff again accused Cromer. Both times Watts told the sheriff that Cromer had nothing to do with Watts' letter. Within a week of this meeting Sheriff Brown fired both Sergeant Watts and Cromer.

The personnel order terminating Cromer said simply that he was fired for conduct "unbecoming an officer." Cromer learned that he was to be fired from Major Barnett. Barnett told Cromer he was being terminated for wrongfully accusing one officer of fixing a drunk driving ticket and for telling another officer that Sergeant Guy had reported (at an Association meeting) that he had been asked to plant drugs in the former county administrator's car. According to Cromer, Major Barnett also admitted that Cromer's membership in the black officers' Association and the Association's letter to the sheriff "had a lot to do with" Cromer's termination. Cromer was then allowed to see the sheriff, who said only, "Pat I'm very disappointed in you and I don't even want to talk to you."**3**

Later, at a hearing before the South Carolina Employment Security Commission, Major Barnett represented the sheriff's office in an effort to block Cromer from receiving unemployment compensation. Major Barnett testified that Cromer's firing was due in part to his involvement in the Association and the "list of grievances" presented to the sheriff. Barnett accused Cromer of using the Association for personal gain instead of refuting the black officers' allegations with facts.

_____

**3** Cromer says he was later told of another reason for his firing: that he had allowed his lieutenants to keep two sets of overtime books when he was captain. In other words, not all overtime was turned in for payroll; overtime not turned in was kept in a second, unofficial set of books and could be taken as "comp time." Cromer responds to all allegations by denying any wrongdoing or improper conduct on his part.

B.

After his firing Cromer was granted a hearing by the Sheriff's Department Grievance Board, an internal body. The board (made up of a captain and two lieutenants) heard Cromer's case and concluded that his firing was justified. Cromer then filed a complaint with the federal Equal Employment Opportunity Commission (EEOC), which determined that Cromer's discharge violated Title VII but that his demotion did not. The EEOC issued Cromer a right-to-sue letter.

Cromer filed this suit in district court on December 21, 1992. As we explained in the introduction, the district court disposed of Cromer's case by granting summary judgment to Sheriff Brown on some claims and by dismissing others. Cromer now appeals.

II.

We must first decide whether the district court was wrong to conclude that Cromer, both as lieutenant and captain, fell under Title VII's exclusion for the "personal staff" of an elected official. This conclusion led the district court to enter summary judgment for Sheriff Brown on Cromer's Title VII claims.

Title VII defines an "employee" as an "individual employed by an employer." 42 U.S.C. § 2000e(f). The definition, however, excludes "any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on the officer's personal staff . . . ." Id.

The reach of Title VII's personal staff exclusion is a question of federal, not state, law. Curl v. Reavis, 740 F.2d 1323, 1327 (4th Cir. 1984). "State law is only relevant `insofar as it describes the plaintiff's position, including his duties and the way he is hired, supervised and fired.'" Id. (internal citation omitted). We must, therefore, ascertain as a matter of federal law what Congress meant by the term "personal staff."

Although the statute does not define "personal staff," the word "personal" certainly narrows the reach of the exclusion to some inti-

11

mate subset of the elected official's staff. With that observation in mind, we look beyond the text to the exclusion's objectives as discussed in our prior cases. We have concluded that"`Congress intended for the personal staff exception to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of an elected official.'" Brewster v. Barnes, 788 F.2d 985, 990 (4th Cir. 1986) (quoting Curl, 740 F.2d at 1328 (quoting Owens v. Rush, 654 F.2d 1370, 1375 (10th Cir. 1981)).**4** Three times we have applied the personal staff exemption in cases involving sheriffs' offices. United States v. Gregory, 818 F.2d 1114 (4th Cir.), cert. denied, 484 U.S. 847 (1987); Curl, 740 F.2d 1323; Brewster, 788 F.2d 985. In each of these cases we were "unwilling to treat all deputy sheriffs as employees, or to exclude them wholesale from [the statute's] protection." Curl, 740 F.2d at 1328. Instead, we explained that whether a given deputy would be treated as a member of a sheriff's personal staff depended on a "careful examination of the nature and circumstances of her role in the Sheriff's Department." Id.; see Brewster, 788 F.2d at 990; Gregory, 818 F.2d at 1117.

In concluding that Cromer was "personal staff" as both captain and lieutenant, the district court said it applied the following "four primary factors" this court "has considered":

> 1. Is promotion of the employee solely up to the sheriff;
>
> 2. Does the employee occupy a position high in the chain of command;
>
> 3. Does the employee have a highly intimate working relationship with the sheriff; and
>
> 4. Does the employee contribute to the making of policy decisions in the sheriff's department?

_____

**4 Brewster** involved the Equal Pay Act. However, the "definition of `employee' in Title VII contains a `personal staff' exemption which is essentially identical to the exemption contained in the Equal Pay Act." Brewster, 788 F.2d at 990 n.7. Therefore, Brewster's reasoning applies here.

12

Cromer v. Brown, C/A No. 6:92-3555-20AK, mem. op. at 4 (D.S.C. Feb. 28, 1994).

We have considered the factors listed by the district court, but we have never characterized them as "primary." Indeed, we have often considered factors left off the district court's list. We have, for example, always emphasized that the "personal staff" exemption is to be narrowly construed. Gregory, 818 F.2d at 1117; Brewster, 788 F.2d at 990; Curl, 740 F.2d at 1328. We have asked whether the employee's position "was created and compensated by the county pursuant to state law."[5] Gregory, 818 F.2d at 1117; see Curl, 740 F.2d at 1328. We have inquired about the full scope of the employee's duties, without limiting the inquiry to whether he is a policy maker. Curl, 740 F.2d at 1328; Brewster, 788 F.2d at 991. We have explored whether the employee worked in the official's political campaign. Brewster, 788 F.2d at 990. And we have considered it significant whether the employee worked under the direction of the official or someone else. Curl, 740 F.2d at 1328.

The factors we have added to those mentioned by the district court are not intended to round out a rigid list. A fact-specific examination of the employee's role is what is required. In general, the examination should focus on whether the employee worked in an intimate and sensitive position of trust, close to the elected official.

When Cromer was a lieutenant, the undisputed facts make it clear that Cromer was not a member of Sheriff Brown's personal staff. First, Cromer did not report directly to the sheriff. He reported to his captain, who in turn reported to the major, who reported directly to the sheriff. Second, as a lieutenant, Cromer rarely saw Sheriff Brown and did not work under the sheriff's personal direction. As a rule Cromer saw the sheriff only at the monthly meetings of all supervisors, including sergeants and lieutenants. At those meetings the sheriff spoke only for a few minutes about very general matters.[6] Third, as

_____

[5] This can be relevant because when a position is created and compensated under state law, the elected official (the employer) is not required to allocate funds from his discretionary budget to pay the employee's salary.

[6] Although the record is not clear on the point, it appears that Sheriff Brown may have attended at least one platoon meeting with Lieutenant Cromer and those in Cromer's platoon.

13

a lieutenant, Cromer had no hand in creating, or even substantively discussing, department policy. Fourth, Lieutenant Cromer was not a member of the command staff. Fifth, Cromer's termination was reviewed by the Grievance Board, which could have recommended reinstatement.[7] Sixth, Cromer apparently did not assist in any of Sheriff Brown's election efforts. Nor was Cromer initially hired as a deputy by Brown. Brown's predecessor in office hired Cromer, and Brown simply recommissioned Cromer as a deputy. Seventh, Cromer's position was created and compensated pursuant to state law. See S.C. Code Ann. § 23-13-10 et seq . Together, the undisputed facts establish as a matter of law that Cromer was not a member of Sheriff Brown's personal staff during his service as a lieutenant. We, therefore, reverse the district court on that issue.

Different facts establish, as a matter of law, that during his service as captain Cromer was on Sheriff Brown's personal staff. First, there were only four captains and all were members of the command staff. Second, as a member of the command staff, Captain Cromer met weekly with the sheriff, the major and the other three captains to discuss the substance and merits of proposed operations, policies and procedures. In fact, Cromer himself acknowledged that as a captain he exerted a "strong, effective voice" on department policy. Third, Sheriff Brown personally promoted Cromer to captain and personally demoted him. There is no suggestion that Cromer could have taken his demotion from captain to the Grievance Board for review. And finally, as a captain, Cromer occasionally dealt with citizens' complaints and other public matters which required him to speak outside the department on behalf of the sheriff. Together, these facts demonstrate as a matter of law that when Cromer was a captain, he served on Sheriff Brown's personal staff. Therefore, we affirm the district court's ruling to that effect.

_____

[7] When a public official cedes exclusive authority to hire or discharge an employee, the personal staff exclusion would not apply. In this case, Sheriff Brown did not cede his exclusive authority, but he did permit the Grievance Board to make a recommendation.

14

III.

We next consider Cromer's constitutional claims, brought under § 1983. Cromer asserts that his termination violated his First Amendment rights to speak freely and to associate. The district court, however, determined that these asserted rights were not clearly established in June of 1991, when Cromer was fired. Therefore, the district court held that Sheriff Brown (in his individual capacity) was entitled to immunity from these claims.

A.

The doctrine of qualified immunity would provide Sheriff Brown, in his individual capacity, with a full defense to Cromer's § 1983 charges if Brown's conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The purpose of the qualified immunity defense under § 1983 is to allow government officials "the freedom to exercise fair judgment" without "being blindsided by liability derived from newly invented rights or new, unforeseen applications of pre-existing rights." Pinder v. Johnson, 54 F.3d 1169, 1173 (4th Cir.) (en banc), cert. denied, 116 S. Ct. 530 (1995).

As we observed in Pinder:

> The linchpin of qualified immunity is objective reasonableness. So long as the officer's actions, viewed from the perspective of the officer at the time, can be seen within the range of reasonableness, then no liability will attach.

> Important to this reasonableness inquiry is whether the rights alleged to have been violated were clearly established at the time of the challenged actions.

> If the law supporting the allegedly violated rights was not clearly established, then immunity must lie. Where the law is clearly established, and where no reasonable officer could

15

believe he was acting in accordance with it, qualified immunity will not attach.

Id. (internal citations omitted).

The right allegedly violated must be articulated in a "particularized" and "relevant" way. Anderson v. Creighton, 483 U.S. 635, 640 (1987). A plaintiff may not merely assert the violation of some "over-arching entitlement" to a named right. Pinder , 54 F.3d at 1173. Instead, he must be sufficiently specific to allow us to decide whether "a reasonable official would understand that what he [did] violates that right." Anderson, 483 U.S. at 640. But "[i]t is important not to be overspecific -- there need not be a prior case directly on all fours with the facts presented to the official." Pinder, 54 F.3d at 1173. Still, we must be able to conclude that, in light of pre-existing law, the unlawfulness of the challenged action was apparent to the official. Anderson, 483 U.S. at 640; Pinder, 54 F.3d at 1173.

1.

Cromer's first allegation is that Sheriff Brown violated his right to speak freely on matters of public concern by firing him for joining in the Association's letter that raised specific charges of racial discrimination and animus in the sheriff's office.

At the time of Cromer's discharge in June 1991, it was established that a government official "may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Rankin v. McPherson, 483 U.S. 378, 383 (1987) (citing Perry v. Sindermann, 408 U.S. 593, 597 (1972)) (emphasis added). To determine whether a public employee's speech was constitutionally protected, we undertake a two-step analysis. First, we ask whether the employee spoke as a citizen on a matter of "public concern." Connick v. Myers, 461 U.S. 138, 146 (1983). If he did, the next step requires "balanc[ing] the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Educ., 391 U.S. 563, 568 (1968). If these two steps yield a right that was clearly established in 1991, we "proceed to determine whether a rea-

16

sonable person in the official's position would have known that his actions violated that right." DiMeglio v. Haines, 45 F.3d 790, 794-95 n.1 (4th Cir. 1995) (citing Harlow, 457 U.S. at 817-18).

a.

We decide whether Cromer spoke as a citizen on a matter of public concern by examining the "content, form and context" of his speech. Connick, 461 U.S. at 147-48.

We turn first to the content of Cromer's speech, the letter the black officers' Association sent to Sheriff Brown. The theme of the letter was that the "effectiveness of the [sheriff's office] as a Law Enforcement Agency" was being destroyed by internal racial discrimination. The seven-page letter included the following charges of discrimination by an "overall white [management] structure": (1) ineffective minority recruitment efforts, (2) lack of opportunity for black officers to cross-train in and transfer into prestigious units, such as white collar and major crimes, (3) lack of promotional opportunities for blacks and loss of faith in the promotion process, (4) methods of investigation by the all-white internal affairs unit that caused racial polarization, and (5) favoritism to white officers in the allocation of new equipment. Because these specific complaints prompted an expression of concern about the inability of the sheriff's office to carry out its vital public mission effectively, we conclude that Cromer and the other members of the Association spoke as citizens, not merely as employees. See id. at 147. Of course, the allegations themselves, about racial discrimination within a law enforcement agency, are matters of serious public import. Rode v. Dellarciprete, 845 F.2d 1195, 1201 (3d Cir. 1985) (holding that allegations of racial animus within the state police raised a matter of "grave public concern"); Leonard v. City of Columbus, 705 F.2d 1299, 1305 (11th Cir. 1983) (holding that allegations of racially discriminatory hiring and distribution of "beat" assignments raised "matters of interest to the community"), cert. denied, 468 U.S. 1204 (1984). Cf. Connick, 461 U.S. at 146, 148 n.8 (characterizing allegations of a school district's "racially discriminatory policies" as "a matter inherently of public concern").

Nothing in the form (private letter with no member of the Association identified) or context (slipped under the sheriff's door) of the

17

speech deprives it of its public import. Public employees do not forfeit the protection of the Constitution's Free Speech Clause merely because they decide to express their views privately rather than publicly. Givhan v. Western Line Consol. Sch. Dist. , 439 U.S. 410, 413-14 (1979).

In any event, the sheriff considered the letter a group effort by black officers, and indeed it was. Virtually all of the black officers in the department participated in the Association. They discussed the items covered in the letter at four meetings, and they sent the letter as a body to voice their concerns about what they considered discrimination. Thus, the letter was not the expression of a single disgruntled employee about a personal employment dispute. See Connick, 461 U.S. at 148 (noting, in reversed circumstances, that the communication at issue "if released to the public would convey no information at all other than the fact that a single employee is upset with the status quo"). Instead, the letter here was delivered in the context or circumstance of a group complaint, and that further demonstrates the public import of the speech. Collins v. Robinson, 568 F. Supp. 1464, 1468 (E.D. Ark. 1983) (memorandum to sheriff for which sergeant was fired involved matters of public concern because, among other things, it expressed the complaints of numerous officers about the behavior of a major), aff'd on the reasoning of the district court, 734 F.2d 1321 (8th Cir. 1984).

In sum, we hold that in 1991 it was clearly established that the Association's letter, which Cromer adopted as his own speech, involved a matter of public concern.

b.

Because Cromer's speech involved a matter of public concern, we must now balance Cromer's interest as a citizen in commenting on racial discrimination in a law enforcement agency against Sheriff Brown's interest in maintaining an efficient workplace. Pickering, 391 U.S. at 568. Interests of the community also weigh in the balance. Piver v. Pender County Bd. of Educ., 835 F.2d 1076, 1078 (4th Cir. 1987), cert. denied, 487 U.S. 1206 (1988) (noting that for speech to be constitutionally protected, "the interests of the speaker and the

18

community in the speech [must] outweigh the interests of the employer") (emphasis added).

We have recently noted that "only infrequently will it be `clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a `particularized balancing' that is subtle, difficult to apply and not yet well-defined." DiMeglio, 45 F.3d at 806. But we did not say that a public employee's right to speak on matters of public concern could never be clearly established. We believe that Cromer's is one of the "infrequent" cases where an employee's right to speak on a matter of public concern was clearly established. **8**

i.

We are persuaded that the interests to be balanced under Pickering weighed so heavily in Cromer's favor that his right to speak about perceived racial discrimination was clearly established in 1991.

We begin our balancing analysis by examining the interests to be weighed on Cromer's side. We have already said that Cromer's

_____

**8** Other circuits have found First Amendment rights to be clearly established in certain cases, even under Pickering 's balancing test. See, e.g., Kincade v. City of Blue Springs, 64 F.3d 389, 398-99 (8th Cir. 1995) (city engineer voiced safety concerns regarding a construction project), cert. denied, 116 S. Ct. 1565 (1996); Lambert v. Richard, 59 F.3d 134, 137 (9th Cir.) (plaintiff criticized library director's mismanagement), cert. denied, 116 S. Ct. 673 (1995); Ramirez v. Oklahoma Dep't of Mental Health, 41 F.3d 584, 593-95 (10th Cir. 1994) (plaintiffs complained of mistreatment of a mental patient); Williams v. Kentucky, 24 F.3d 1526, 1537 (6th Cir.) (plaintiff reported employer's illegal activities), cert. denied, 115 S. Ct. 358 (1995); Bieluch v. Sullivan, 999 F.2d 666, 673 (2d Cir. 1993) (police officer headed groups which campaigned against a school construction proposal and a proposed town budget), cert. denied, 114 S. Ct. 926 (1994); Gorman v. Robinson, 977 F.2d 350, 356 (7th Cir. 1992) (plaintiff informed FBI of his employer's wrongdoings); Stough v. Gallagher, 967 F.2d 1523, 1528-29 (11th Cir. 1992) (captain spoke in support of sheriff's political opponent); Brawner v. City of Richardson, Tex., 855 F.2d 187, 191 (5th Cir. 1988) (police officer made serious allegations of possible police misconduct).

19

speech (reporting widely-held views about racial discrimination in the sheriff's office) involved a matter of grave public concern. Indeed, "speech on public issues occupies the `highest rung of the hierarchy of First Amendment values.'" Connick, 461 U.S. at 145 (citation omitted).

We emphasize that this is not a "run-of-the-mine single plaintiff discrimination case." See Auriemma v. Rice , 910 F.2d 1449, 1460 (7th Cir. 1990) (en banc), cert. denied 501 U.S. 1204 (1991). Although Cromer is the only plaintiff, the speech he adopted is a letter sent by a group of most of the 32 black officers who worked for Sheriff Brown. Cromer's speech, therefore, had the potential for "broad impact," id., because public safety was put at risk by the group perception that black officers were discriminated against. In other words, the effectiveness of a major law enforcement agency was being called into question by a significant number of its members. The public has a fundamental interest in effective law enforcement organizations that are free of discrimination. Cromer's individual interests, then, merge in a real sense with those of the community at large. Those merged interests are substantial. "For a police force to be effective it must have the respect and support of the community as well as its officers; our system of government demands that support be garnered through informed evaluation of circumstance, and not through the suppression of dissent." Leonard, 705 F.2d at 1305. Accordingly, the public has a keen interest in seeing that police officers are free to speak up about any broad-based discrimination in their agencies. After all, "[g]overnment employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions." Waters v. Churchill, 114 S. Ct. 1878, 1887 (1994). These interests weigh heavily in Cromer's favor.

We now weigh the interests of Sheriff Brown, "as an employer, in promoting the efficiency of the public services[the sheriff's office] performs through its employees." See Pickering, 391 U.S. at 568. In weighing the sheriff's interests, we bear in mind that when the employer runs a law enforcement organization where"discipline is demanded," he has "greater latitude . . . in dealing with dissension in [the] ranks." Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992), cert. denied, 506 U.S. 1080 (1993).

20

Here, Sheriff Brown maintains that Cromer's speech carried the potential for disrupting efficiency because it cut against discipline, morale and good working relationships in the department. We examine the extent to which Cromer's speech undermined these interests.

We look preliminarily at Cromer's position and status when he engaged in the speech. Sheriff Brown charges that Cromer endorsed the grievances presented by the black officers' group and "did nothing to diffuse the tense racial situation presented by the formation of [that] group." Brief of Appellees at 23. The sheriff says that he looked to Cromer to maintain good race relations in the department. Thus, the sheriff maintains that Cromer could (and should) have spoken up at the black officers' meetings and allayed the concerns expressed by the Association. This might well be an accurate representation of what the sheriff expected of Cromer when he was a captain, but it significantly overstates Cromer's responsibility and influence after he was demoted from the command staff to lieutenant.

Sheriff Brown testified that he demoted Cromer because he had "lost his ability and his effectiveness as commander of the uniform patrol" by supervising through use of intimidation and retaliation. According to the sheriff, Cromer had lost the respect of the lieutenants and sergeants he supervised. Cromer, for his part, believed he was demoted for racial reasons. After his demotion Cromer rarely saw the sheriff and did not participate in policymaking. Under these circumstances it is not plausible that Sheriff Brown would have looked solely to the demoted Cromer to foster racial harmony. Nor could the sheriff have expected the demoted Cromer to argue that the department was free of racial discrimination, nor expected other black officers to follow Cromer if he had said the charges in the letter were groundless.

Nevertheless, Cromer was a lieutenant, and we must weigh how much his speech worked against the efficiency interests asserted by the sheriff: discipline, morale and good working relationships.

As to discipline, the sheriff says that "Cromer never followed the chain of command in presenting the [black] officers' grievances." Brief of Appellees at 24. "Rather, he attended clandestine meetings and endorsed the sending of an anonymous letter." Id. According to

21

Sheriff Brown, by not presenting the grievances in person to a superior, Cromer undermined the authority of the command staff and the sheriff. The sheriff maintains that this lack of discipline made Cromer an "antagonist[ ]" who had to be "eradicate[d]." See id. at 26.

Sheriff Brown did have an interest in seeing that any grievance was channeled up through the chain of command under the name of the officer receiving it (or sending it along). Yet that interest in good discipline must in turn be measured against what happened here. The black officers did not make their allegations of discrimination public. Instead, the letter was given only to Sheriff Brown, so that any deviation from good order and discipline was known only to him and the members of the Association. The letter was not insubordinate or rebellious in tone, and there was no public display of disobedience or protest. Moreover, although the letter was anonymous in the sense that no one signed it, it was clear that virtually all black officers were behind it. And it goes without saying that Sheriff Brown knew who the black officers were.

To sum up on the discipline interest: we give some weight to Sheriff Brown on this point. We do not, however, give him any great weight because the black officers moved quietly and did not try to provoke a public confrontation.

On morale, Sheriff Brown says that Cromer harmed morale by joining in a letter containing grievances that Cromer knew were groundless. We recognize the importance of good morale in a law enforcement organization. Yet here we do not see how Cromer's participation in the speech could have done much to lower the morale of black officers. The fact that meetings were held and the letter was written indicates that their morale was already low. Moreover, when we consider how the demoted Cromer was regarded (according to the sheriff, Cromer had lost the ability to lead and lost the respect of the officers he had supervised as captain), we do not see how Cromer could have done much to lift morale even if he had spoken up in defense of the sheriff. We give Sheriff Brown very little weight on the interest in good morale.

We turn last to the sheriff's interest in maintaining good working relationships. Specifically, Sheriff Brown says that his close working

22

relationship with Cromer was destroyed when Cromer endorsed the Association's letter. When Cromer was one of four captains on the six-person command staff, we have no doubt that the sheriff and Cromer had a close working relationship. That relationship ended, however, when Cromer was demoted. After his demotion Cromer did not work directly with the sheriff and rarely saw him. We give no weight to the sheriff on this point.

As we stand back and look, the scales weigh heavily in Cromer's favor. His interest in speaking about the widespread (internal) perception of racial discrimination in a law enforcement agency must be given great weight. And the community at large shares in that interest. We have, of course, taken care to weigh the efficiency interests advanced by the sheriff -- discipline, morale and good working relationships. Given Cromer's demotion and diminished status, however, his speech had little or no impact on those interests, and we therefore accord them little or no weight in this case. The balancing test clearly establishes that Cromer's speech was protected.

ii.

Our conclusion is buttressed by the fact that, at the time Sheriff Brown fired Cromer, existing decisions in our sister circuits had given First Amendment protection to speech like Cromer's, that is, a police officer's expressions of concern about racial discrimination and animus in his agency.[9]

The most strikingly similar prior case is Leonard v. City of Columbus, 705 F.2d 1299 (11th Cir. 1983), cert. denied, 468 U.S. 1204 (1984). Leonard involved members of the Columbus, Georgia, police department who in 1971 formed the Afro-American Patrolmen's League. The officers formed the League as a vehicle to criticize department practices which they viewed as discriminatory. In particular, the League's members complained that black officers were being discriminated against in hiring and promotion, shift assignment,

_____

[9] In deciding whether Cromer is asserting a clearly established right, we may examine the pre-existing law outside this circuit. See Pinder, 54 F.3d at 1176-1178 (canvassing decisions outside the Fourth Circuit in a qualified immunity case).

and discipline and alleged that black citizens were subjected to police brutality. League members initially complained to the city's Board of Public Safety, but members felt that this resulted in no progress. Thereafter, the League issued a press release and held a press conference to publicize its criticism of the police department. Three days after the press conference a black officer, who had called in sick, was disciplined with the extraordinary measure of arrest for contempt of court for missing a scheduled court appearance. League members responded with two days of peaceful picketing at the police station. On the second day of the protest, the Deputy Chief of Police started suspension proceedings against three policemen who were League officials. On the third day, with the press present, seven picketing black officers assisted one another in removing the American flag emblem from the sleeves of their uniforms. Later that day, the Chief of Police held a press conference to announce the firing of all protesting officers. The chief publicly accused the officers of making "baseless allegations of unlawful conduct, racism, and discrimination." Id. at 1301. The fired officers sued, and the district court determined that their dismissal did not violate the First Amendment. But on appeal the Eleventh Circuit determined that the protesting officers' speech was protected under Pickering's balancing test. Id. at 1304-06.

Cromer's case is indistinguishable from Leonard  in several relevant respects. First, like the officers in Leonard, Cromer spoke through an association of black officers formed in response to perceived racism in their law enforcement agency. Second, the majority of the complaints voiced by Cromer's Association were identical to those made by the League in Leonard. Cromer's Association alleged discrimination against black officers in recruitment, promotion, cross-training and transfer, and equipment. The League in Leonard alleged discrimination in hiring and promotion, shift assignment and discipline. Finally, the reaction of the sheriff in Cromer's case was the same as that of the police chief in Leonard: both officials felt that the allegations of the black officers were baseless and fired those they regarded as the main culprits.**10**

_____

**10** The cases do differ as to the methods used by the officers to convey their speech. The officers in Leonard, after an initial effort to deal with the Board of Public Safety, resorted to press conferences, picket lines

24

Leonard, on facts quite similar to Cromer's, recognized that the fired officers had "sought [through their speech] to emphasize a widely-held perception of racially discriminatory practices in the City of Columbus Police force." Id. at 1305. This speech, about a matter "vital to the public interest," deserved constitutional protection. Id. at 1304-05. And Leonard bluntly warned officials not to try to suppress such speech:

> For a police force to be effective it must have the respect and support of the community as well as its officers; our system of government demands that support be garnered through informed evaluation of circumstance, and not through the suppression of dissent . . . . [A] police officer does not receive a "watered-down version" of constitutionally protected rights by virtue of his employment on the police force.

Id. at 1305 (citations omitted).

In addition to Leonard, other decisions in our sister circuits made plain that the First Amendment does not allow state officials to take adverse employment action against an employee who speaks out about the practice of racial discrimination in a law enforcement agency. See Rode, 845 F.2d 1195 (First Amendment protected state police civilian employee whose speech involved a matter of grave public concern, racial animus within state police); Auriemma, 910 F.2d 1449 (First Amendment protected white officers' right to complain in federal court about alleged racial discrimination in department reorganization); see also Bridgeport Guardians, Inc. v. Delmonte, 553 F. Supp. 601 (D. Conn. 1982) (enjoining police department from taking adverse employment actions against members

_____

and symbolic acts of disobedience. In Cromer's case the officers complained privately. Thus, the speech of the officers in Leonard was far more detrimental than was Cromer's to the state's interest in discipline or efficiency. Yet the court of appeals in Leonard concluded that the disobedient speech in that case was protected under the Pickering balancing test.

25

of police officers' organization opposing racially discriminatory practices of department).

Leonard and the similar authority that existed at the time of Cromer's termination bolster our holding that Cromer's First Amendment right to voice his concern about racial discrimination in his law enforcement agency was clearly established in June of 1991.**11**

c.

At this point in the analysis, all that remains is Harlow's reasonableness inquiry. Harlow, 457 U.S. at 818 (immunity shields officials "insofar as their conduct does not violate clearly established rights of which a reasonable person would have known"). We ask whether an objectively reasonable official in Sheriff Brown's position would have known that he could not fire Cromer for participating in the Association's complaint about racial discrimination in the workplace. Pinder, 54 F.3d at 1173. "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent

_____

**11** We pause to point out that our holding is a narrow one. It is the infrequent Connick claim that will survive a qualified immunity defense. See DiMeglio, 45 F.3d at 806. Thus, we are not holding that any time a public official fires or otherwise disciplines an employee who has complained of discrimination, the official has to go to trial. Rather, this is the infrequent case where, after the Pickering balancing, the employee had the right to speak as a citizen about extensive and specific claims of racial discrimination. This case is quite different from one where "a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." Connick, 138 U.S. at 147. Here, Cromer joined about thirty other black officers to complain that the effectiveness of the sheriff's office as a law enforcement agency was being jeopardized by the following examples of racial discrimination: ineffective minority recruitment, lack of opportunity for black officers to work in prestigious units, lack of promotional opportunities for black officers, internal investigation practices that pitted white officers against black officers, and favoritism to white officers in the allocation of new equipment. These charges were specific enough and serious enough to give the community at large an interest in the matter. And they were presented in a non-confrontational way that did not appreciably affect the sheriff's efficiency interests.

26

public official should know the law governing his conduct." Harlow, 457 U.S. at 800. Accord DiMeglio, 45 F.3d at 794-95 n.1.

Because the Pickering balancing test tips decidedly in Cromer's favor and because caselaw had confirmed his right to speak, we hold that any reasonable official in Sheriff Brown's shoes would have realized he would violate the Constitution if he fired Cromer for speaking of widely held concerns about racial discrimination in the sheriff's office. Accordingly, we reverse the district court's ruling that Sheriff Brown was entitled to qualified immunity with respect to Cromer's free speech claim.

2.

Cromer's second constitutional claim is that Sheriff Brown violated his right of association by firing him for participating in the black officers' Association. Again, Sheriff Brown defends himself on grounds that Cromer's associational rights were not clearly established in June of 1991. The parties and the court below treated the association and speech claims as inseparable. That approach is logical in this case because the Association existed solely to convey the black officers' complaints about racial discrimination.

The right to associate in order to express one's views is "inseparable" from the right to speak freely. Thomas v. Collins, 323 U.S. 516, 530 (1945); Shelton v. Tucker, 364 U.S. 479, 486 (1960) (the "right of free association [is] a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society"). The Supreme Court has explained that:

> An individual's freedom to speak, to worship, and to petition the Government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed . . . . Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

27

Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984) (citations omitted). Accordingly, since Cromer's personal right to speak about allegations of racial discrimination within his agency was clearly established in 1991, we hold that his "correlative freedom to engage in group effort toward those [same] ends" was likewise clearly established. Since Cromer had the clear right to speak as part of the Association, he also had a clear right to participate in the Association. See N.A.A.C.P. v. Alabama ex rel. Patterson, 357 U.S. 449, 460 (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the`liberty' assured by the Due Process Clause of the Fourteenth Amendment which embraces freedom of speech."); Wilton v. Mayor and City Council of Baltimore, 772 F.2d 88, 91 (4th Cir. 1985) (noting that the limitations on a public employee's right to associate are "closely analogous" to the limitations on his right to speak).

Given these principles, we find that any objectively reasonable person in Sheriff Brown's shoes (in June of 1991) would have realized that he would violate Cromer's constitutional rights if he fired him for participating in the Association. See, e.g., Marshall v. Allen, 984 F.2d 787, 799 (7th Cir. 1993) (holding that, in 1988, it was clearly established that freedom of association protected employee from being fired for associating with co-workers who filed a civil rights action against their agency).

We therefore reverse the district court's determination that Sheriff Brown was entitled to qualified immunity from Cromer's free association claim.

IV.

Last, we turn briefly to the district court's determination that Cromer cannot pursue his § 1983 claims against Sheriff Brown in his official capacity. The Eleventh Amendment bars suits in federal courts for money damages against an "unconsenting State." Edelman v. Jordan, 415 U.S. 651, 663 (1974). This immunity extends to "arm[s] of the State," Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977), including state agencies and state officers acting in their official capacity. Gray v. Laws, 51 F.3d 426, 430 (4th Cir. 1995). The "largely, if not wholly, dispositive" factor in

28

determining whether an entity is properly characterized as an arm of the state is whether the state treasury will be liable for the judgment. Id. at 433; see also Bockes v. Fields, 999 F.2d 788, 790-91 (4th Cir. 1993), cert. denied, 114 S. Ct. 992 (1994). If the state's treasury will not be affected by the judgment, we consider other factors, "chief among which are whether the suit will jeopardize `the integrity retained by [the] State in our federal system' and whether the state possesses such control over the entity claiming Eleventh Amendment immunity that it can legitimately be considered an `arm of the state.'" Gray, 51 F.3d at 434 (quoting Hess v. Port Auth. Trans-Hudson Corp., 115 S. Ct. 394, 400 (1994)) (internal citation omitted).

Judgments against the Greenville County Sheriff are paid by the South Carolina State Insurance Reserve Fund. However, we are unable to discern from the record in this case whether the state pays any premiums on behalf of Greenville County. See Nelson v. Strawn, 897 F. Supp. 252, 257-58 (D.S.C. 1995) (noting the same difficulty when presented with a similar question), aff'd in part, vacated in part on other grounds, 78 F.3d 579 (1996). Compare Bockes, 999 F.2d at 790 (record demonstrated that state paid 80 percent of premiums on behalf of the subscribing agencies). Thus, it is unclear whether the state treasury would be partially liable for a judgment in this case. However, we have considered the remaining factors relevant to the immunity analysis and conclude that, in his official capacity, Sheriff Brown is an arm of the state. See Gulledge v. Smart, 691 F. Supp. 947 (D.S.C. 1988) (holding that South Carolina sheriffs are state officials for Eleventh Amendment purposes), aff'd mem., 878 F.2d 379 (4th Cir. 1989). Thus, we affirm the district court's conclusion that, in his capacity as a state official, Sheriff Brown is immune from suit under § 1983 for money damages.

However, to the extent Cromer sought injunctive relief (e.g., rein-statement) against Sheriff Brown in his official capacity, the district court should not have granted summary judgment to Sheriff Brown. Eleventh Amendment immunity does not protect state officials in their official capacities from § 1983 claims for injunctive relief. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 n.10 (1989). Therefore, we reverse the district court's dismissal of Cromer's § 1983 claims against Sheriff Brown in his official capacity insofar as they request injunctive relief.

V.

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

30