WILKINSON, Circuit Judge,
dissenting:
I appreciate the majority’s thoughtful opinion in this case. I cannot join it, however, because it does public education too much harm. In what are surely some of the toughest jobs in America, principals and superintendents struggle to deal with troubled schools, budget deficits, and teacher shortages. Sadly, their jobs just got even harder. At issue here is nothing more than Superintendent Don Martin’s decision to separate Brenda Blanchfield and DeComa Love-Lane, two administrators embroiled in a personality conflict that was diverting energy from the education of young children. To strip a superintendent of qualified immunity for this sort of personnel action is an extraordinary step. After all, the whole purpose of qualified immunity is to preserve a degree of discretion and latitude on the part of those who run our nation’s public schools. Principals’ and superintendents’ decisions are inevitably going to disappoint at least some combination of teachers, students, parents, and the public. These beleaguered officials will now find themselves fettered by yet another constraint: the constant concern that their routine decisions will give rise to federal lawsuits.
Moreover, the majority’s decision gives rise to a circuit conflict. In evaluating Martin’s interest in reassigning Love-Lane, the majority considers only the substance of Love-Lane’s speech, and not the disruption caused by Love-Lane’s lack of tact and confrontational manner. The majority’s narrow focus is out of step with decisions of the Supreme Court, of our own court, and of our sister circuits, which have consistently found that employers are not required to ignore the intemperate tone or unprofessional manner in which employees may choose to express themselves. See Part II.B, infra. Speech in an office setting is simply different from, for example, speech in a classroom, speech in a campaign, or speech on the street. While speech in the public square may profitably be caustic and even vitriolic, that same type of speech in the workplace can rend the fabric of important relationships and interfere with the provision of valuable services to the public. The majority’s holding to the contrary will work to the detriment not simply of public school systems, but of public offices throughout this circuit.
I agree with my colleagues that Love-Lane had an opportunity to make an important contribution to race relations at Lewisville. I agree further with the majority that it is important to have honest discussion on matters of race. If the record showed that Martin had reassigned Love-Lane for her speech on racial issues, I would unreservedly join the majority’s opinion. Instead what the record reveals, and what the district court found, is that Love-Lane was reassigned for speaking out on a number of issues, most of which had nothing to do with race, in such an intemperate manner that it disrupted the school in which she was working. A host of teachers and administrators — female and male, African-American and Caucasian — found Love-Lane’s manner harsh and uncivil. By turning a blind eye to this evidence, the majority’s decision will handicap principals and superintendents who labor to create environments in which education can move forward. The ultimate cost, however, will be borne by students of all races and walks of life who will be denied the opportunity for more effective learning.
Part I of this dissent demonstrates the correctness of the district court’s view *791 that the personal relationship between Brenda Blanchfield and DeComa Love-Lane had become so contentious as to require a new management team at Lew-isville Elementary. Part II explains why the majority is mistaken in concluding that Love-Lane has a First Amendment claim for retaliatory discharge, and details the adverse effects for public schools that flow from the majority’s decision. Part III describes the more troubling consequences of the majority’s second blow to public school administration — that of denying even qualified immunity to principals and superintendents for their ordinary personnel decisions. Part IV discusses the implications of the majority’s analysis not only for school administration, but for school discipline. Finally, Part V reflects briefly on the burdens that litigiousness is imposing on public education vis-# 27# -vis other forms of education. For as important as private and home schooling are, America will never fulfill the true promise of pluralism without a strong public education system.
I.
A look at what transpired at Lewisville Elementary School between 1995 and 1998 makes clear that a simple personality dispute has been misleadingly cloaked in constitutional clothing. Taking the facts in the light most favorable to DeComa Love-Lane, as we must, does not mean ignoring facts unfavorable to Love-Lane that are not in dispute. Teachers and administrators, whatever their gender or race, found Love-Lane’s demeanor unprofessional and contentious. By failing to consider this uncontroverted evidence, the majority converts an ordinary personnel decision into a constitutional cause of action.
In the summer of 1995, Dr. Donald Martin, Superintendent of the Winston-Salem Forsyth County Schools, named DeComa Love-Lane an assistant principal at Lewis-ville Elementary in Lewisville, North Carolina. During Love-Lane’s three-year tenure at Lewisville, she came into conflict with both teachers and other administrators, especially Brenda Blanchfield, Lewis-ville’s principal and Love-Lane’s immediate superior. It was this breakdown in Love-Lane’s working relationships, and not Love-Lane’s exercise of speech protected by the First Amendment, that drove Martin’s decision to reassign her to a teaching position.
Love-Lane’s difficulties at Lewisville began during the 1996-97 school year as a result of Love-Lane’s opposition to the school’s time-out room. Lewisville’s timeout room was an intermediate step between in-class discipline and out-of-school suspension for students whose classroom behavior was disruptive. It was similar to those of many other schools, and its operation was governed by extensive procedures and overseen by a discipline committee. J.A. 269, 329-30, 744-47, 1267. The timeout room was recommended by a School Improvement Team composed of teachers and parents, and its use was approved by Blanchfield. J.A. 1266. It was also voted on and endorsed by Lewisville’s entire staff at a faculty meeting in September 1996. J.A. 740, 1266. Love-Lane objected at the meeting that the room adversely impacted minority students. After the meeting several teachers complained to Blanchfield that Love-Lane had called them “unprofessional” for supporting the program. J.A. 131, 740, 823, 955, 1153. Love-Lane continued to oppose the program even after the meeting.
This dispute over use of the time-out room may have foreshadowed future conflict between Love-Lane and others at Lewisville, particularly Blanchfield. However, it was not nearly so central to the ongoing conflict as Love-Lane suggests. *792 In fact, relations between Blanchfield and Love-Lane steadily deteriorated throughout the spring of 1997 over a host of other issues that had little to do with disciplinary practices or their impact on minority students. These issues included bus loading and unloading, a first-grade teacher’s absence from the playground during recess, a kindergarten teacher’s treatment of her students, a disagreement within the custodial staff, and Blanchfield’s annual evaluation of Love-Lane. J.A. 858-59, 866-69, 968-69, 1252. To take but one example, Love-Lane disagreed with Blanchfield’s instructions about where Love-Lane should stand during bus loading and unloading. When Blanchfield was not present, Love-Lane ignored her instructions and did not stand where Blanchfield had requested. J.A. 187-88
Many of these administrative disagreements were aired in increasingly angry memos sent by Love-Lane and Blanchfield to each other, and copied to Superintendent Martin and Assistant Superintendent Ron Montaquila. J.A. 858-60, 866, 868-69. Before long Montaquila was called in to mediate, and he sat in on numerous conferences at the disputants’ request. These conferences typically lasted several hours, and, according to Montaquila, they usually degenerated into lengthy harangues by Love-Lane about her frustration with Blanchfield. J.A. 1002-03. Montaquila relayed to Martin both the substance of the conferences and their ineffectiveness in improving relations between Blanchfield and Love-Lane. J.A. 1004.
Martin then intervened personally beginning late in the spring of 1997, and his observations over the course of several meetings were the same as Montaquila’s. J.A. 968-69. In November 1997, Amanda Bell took over for Montaquila as the assistant superintendent in charge of Lewis-ville. Like Montaquila and Martin, Bell had numerous lengthy meetings with Blanchfield and Love-Lane. And like Montaquila and Martin, Bell observed that Love-Lane frequently voiced disagreement with Blanchfield in a disrespectful and intemperate manner; she defied Blanchfield’s instructions on even minor matters; and she did not respond favorably to Martin’s constructive criticism. J.A. 289. These were the reasons that Bell, herself an African-American female, concluded that Love-Lane was having problems at Lewisville — not because Love-Lane was speaking out on minority issues. J.A. 290.
Martin’s concerns about Love-Lane’s effectiveness as an administrator were amplified on the last day of school before the 1997 summer recess, when Love-Lane and a teacher, Angie Anderson, were involved in a heated confrontation in the hallway outside Love-Lane’s office. Their disagreement concerned whether Anderson had questioned one of Love-Lane’s decisions in regard to some teaching materials. Three separate investigations of the incident were conducted by Blanchfield; Mon-taquila; and David Fairall, the human resources manager for the school system. All three concluded that both Love-Lane and Anderson had used profanity and otherwise acted unprofessionally. When Love-Lane objected to these findings, Martin appointed John Siskind, a paralegal for the school district, to perform an independent investigation. J.A. 968. After conducting his own interviews, Siskind agreed with Blanchfield, Montaquila, and Fairall that Love-Lane had used profanity and behaved inappropriately. J.A. 1030, 1033-35. At that point, after four investigations had reached precisely the same conclusion, Martin placed a letter of reprimand in Love-Lane’s file. J.A. 975A.
The incident between Love-Lane and Anderson only further strained the ability *793 of Blanchfield and Love-Lane to get along. In October 1997, Martin authored a memo to them that addressed the breakdown in their working relationship and its adverse effect on the administration of Lewisville Elementary. J.A. 473. Rather than assign blame, Martin charged Blanchfield and Love-Lane with rebuilding their relationship and achieving the loyalty, trust, and mutual respect necessary to function effectively as an administrative team. J.A. 473.
Unfortunately, Love-Lane’s working relationships with others in the school system further declined during the 1997-98 school year. For example, in January 1998 Love-Lane had a meeting with the six fifth-grade teachers at Lewisville. The teachers came away so upset by Love-Lane’s tone during the meeting that the entire group requested they be assigned a new administrator for the rest of the school year. J.A. 728-29. When Blanch-field repeatedly declined their request, several of the teachers took the unusual step of appealing to Martin himself. J.A. 970-71. In the process, the teachers complained about Love-Lane’s poor communication on issues like a grant proposal, school-sponsored sleepover, and food drive. J.A. 725, 727-31, 957-58. Notably, as with the earlier disputes between Blanchfield and Love-Lane over administrative tasks like bus duty, these disagreements had nothing to do with Love-Lane’s speech on racial issues.
By this point, Martin had devoted considerable time and energy to Love-Lane’s disagreements with others at Lewisville. Neither Bell nor Montaquila felt that Love-Lane had responded encouragingly to their suggestions for improvement, and this squared with Martin’s own observations. Martin then did precisely what he had outlined in his October 1997 memo to Blanchfield and Love-Lane: he reorganized the administrative team at Lewisville Elementary, because Blanchfield and Love-Lane had been unable to establish an effective working relationship. Blanch-field was transferred to the central office, receiving a substantial reduction in her salary. J.A. 971-72. And Love-Lane was reassigned to a teaching position for the 1998-99 school year. J.A. 971, 986.
Love-Lane filed a formal grievance with the school board in response to her reassignment. The board specifically found that Martin’s decision was amply supported by the performance evaluations of Love-Lane, the results of the investigations into the incident between Love-Lane and Anderson, and Love-Lane’s failure to achieve the standards set out in Martin’s October 1997 memo. J.A. 281-84, 327. Love-Lane did not present the board with any evidence that her reassignment was in retaliation for her speech on racially charged issues. J.A. 278-79. Rather, all of the evidence submitted to the board by both Love-Lane and Martin indicated that Love-Lane believed she was being harassed and sabotaged by Blanchfield, while Blanchfield believed she was being disrespected and undermined by Love-Lane. J.A. 278-81. In short, this was a bitter and acrimonious dispute between two employees. Martin wanted them to function as a team, and when they proved unable to do so, he did what sensible employers often do: he lessened their professional responsibilities. It is important moreover that Martin in no way singled out Love-Lane for reassignment. Instead, he sought to restructure the entire administrative team.
II.
The doctrine of qualified immunity exists precisely so that government officials can make reasonable discretionary decisions without the paralyzing fear of legal *794 liability. See, e.g., Pinder v. Johnson, 54 F.3d 1169, 1173 (4th Cir.1995) (en banc) (“Qualified immunity thus allows officials the freedom to exercise fair judgment. ...”). Qualified immunity therefore protects government officials “as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.” Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In addressing this question, we do not impose on officials “a duty to sort out conflicting decisions or to resolve subtle or open issues. ‘Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.’” McVey v. Stacy, 157 F.3d 271, 277 (4th Cir.1998) (quoting Ma-ciariello v. Sumner, 973 F.2d 295, 298 (4th Cir.1992)).
Simply put, Martin’s decision to reassign Love-Lane to a teaching position transgressed no bright line; it violated no clearly established constitutional right. Indeed, it is unlikely that Martin’s decision to reassign Love-Lane violated her right to free speech at all. To determine whether Love-Lane even has a cause of action under the First Amendment for retaliatory demotion, we must balance Love-Lane’s interest in commenting upon matters of public concern against the school system’s interest in providing effective educational services at Lewisville Elementary. McVey, 157 F.3d at 277 (quoting Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)); Thus we must ascertain (1) whether Love-Lane was speaking as a citizen upon a matter of public concern or as an employee upon a matter of personal interest; (2) whether Love-Lane’s interest in speaking on the matter of public concern outweighed the school system’s interest in providing effective educational services; and (3) whether Love-Lane’s speech was a substantial factor in Martin’s decision to reassign her. Id. at 277-78. I shall address the three prongs of the inquiry in turn.
A.
The first question is whether Love-Lane was even speaking as a citizen upon a matter of public concern or rather as an employee upon a matter of personal interest. Insofar as Love-Lane objected to Lewisville’s use of the time-out room because of its alleged discriminatory impact on minority students, she may well have been speaking on a matter of public concern. Yet any administrator or teacher is likely over time to speak out on some matter of concern to local parents and residents. This ought not convert a routine personnel decision into a constitutional infraction. After all, Love-Lane expressed herself on a whole host of issues, from bus duty to her own performance evaluation, that were purely internal matters of school administration.
In fact, it was Love-Lane’s expression on these administrative matters, not her opposition to the time-out room, that drove her difficulties at Lewisville. The majority’s claim that “teachers and administrators who took offense at Love-Lane’s manner or tone also took offense at the content of her speech opposing race discrimination” finds no support in the record. Ante at 778. For instance, in the four pages of complaints about Love-Lane presented by the fifth-grade teachers to Blanchfield and then Martin, the teachers do not even mention Love-Lane’s opposition to the time-out room or any other disciplinary practice. J.A. 727-28, 730-31. In the extensive documentation compiled by the four separate investigations of the argument between Love-Lane and Angie Anderson, there is no hint that Love-Lane’s opposition to any disciplinary practice, including the time-out room, was a *795 factor in the confrontation. J.A. 845-47, 877-79, 948-45, 1033-35. In Love-Lane’s many lengthy memos to Blanchfield, Martin, and Montaquila throughout 1997, she does not include her opposition to any disciplinary practice as a source of friction between her and others at Lewisville. J.A. 858-60, 866-67, 871-72, 1011, 1251.
Indeed, even as late as the board hearing on Love-Lane’s reassignment, Love-Lane and her counsel maintained that the disagreements between Blanchfield and Love-Lane were “personal in nature” and that Love-Lane’s career “was being sabotaged by Ms. Blanchfield.” J.A. 278-79. Love-Lane never argued, and thus the board never considered, that she was being retaliated against for having spoken out on allegedly discriminatory practices at Lewisville. For Love-Lane to argue now that her reassignment resulted from her opposition to the time-out room, she must assign hugely disproportionate weight to the fraction of her speech that touched on a matter of public interest. Portraying Love-Lane’s speech as primarily of public concern is more the product of counsel’s post-hoc creativity than of any actual events at Lewisville.
The majority gets it backward, then, when it says the dissent’s focus is too limited. See ante at 777. The point is that Love-Lane’s speech on allegedly discriminatory practices was but a small part of her tenure at Lewisville. When one examines the “context” of Love-Lane’s speech “as revealed by the whole record,” it could hardly be clearer that Love-Lane and others were at odds over a slew of matters having no connection to public concerns. Connick v. Myers, 461 U.S. 138, 147-48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Relationships foundered and deteriorated over the day-to-day details of school administration, and they became poisoned to the point where someone in charge simply had to make a change.
B.
Even if one were to overlook the fact that the bulk of Love-Lane’s speech bore no relation to matters of public concern, Love-Lane’s interest in expressing herself still must be weighed against the interest of the Board and the Superintendent in “discipline, morale and good working relationships” at Lewisville Elementary. Cromer v. Brown, 88 F.3d 1315, 1328 (4th Cir.1996); see also Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The district court properly found that Martin’s interest in maintaining an orderly, effective administration at Lewisville outweighed Love-Lane’s speech interest.
Indeed, the district court conducted an extensive review of the record in this case, and it emphatically concluded that Love-Lane had proceeded in a confrontational manner disruptive to Lewisville’s operation. According to the district court, Love-Lane
antagonized and insulted those who used the Time-Out Room and refused to assist the Time-Out Room coordinator in its administration. She failed to develop effective working relationships with other staff, driving some to appeal to the superintendent to replace her. She used profanity in an inappropriate confrontation with a teacher. She resisted feedback or constructive criticism. She repeatedly challenged her principal’s judgment. She refused to rebuild an effective working relationship with Blanchfield....
In the face of all this, it simply blinks reality to claim that Love-Lane’s difficulties with others at Lewisville “did not affect the ability of administrators and teachers at Lewisville to deliver their edu *796 cational services.” Ante at 779. When Blanchfield and Love-Lane were constantly at each other’s throats; when Love-Lane and Anderson were shouting at each other in the hallways; or when an entire group of teachers were complaining that they had been repeatedly undermined by Love-Lane, the effective operation of Lew-isville Elementary had given way to internal divisiveness. And that is to say nothing of the time and energy that Martin, Bell, and Montaquila each had to devote to the incessant conflict at Lewisville. In fact, in his October 1997 memo to Blanch-field and Love-Lane, Martin wrote that theirs was the most acrimonious and divisive conflict between two administrators he had ever seen. J.A. 976.
In the face of such protracted infighting, Martin concluded that the effective administration of Lewisville was being hampered. He did not jump to this conclusion, and he did not assign either Blanchfield or Love-Lane exclusive blame. He simply believed that the situation had to be changed. Martin’s professional judgment in this regard is entitled to respect. ‘When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer’s judgment is appropriate.” Connick v. Myers, 461 U.S. 138, 151-52, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (emphasis added). We need not rely on Martin’s subjective judgment that Love-Lane’s speech harmed cohesiveness and efficiency at Lewisville. Rather, there was ample objective evidence that underpinned Martin’s judgment and on which the district court relied.
The majority shows no deference at all to Martin’s judgment, largely because it focuses only on the disruption caused by the substance of Love-Lane’s speech, and not on the disruption caused by Love-Lane’s antagonistic manner. Yet in weighing the interests of Love-Lane and the school system, Love-Lane’s speech “[is] not [to] be considered in a vacuum; the manner; time, and place of [Love-Lane’s] expression are relevant, as is the context in which the dispute arose.” Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (emphasis added). We have repeatedly balanced the respective interests not merely in terms of the “subject” on which the employee speaks, but also in terms of the “manner, time, and place” in which an employee elects to express himself. DiMeglio v. Haines, 45 F.3d 790, 805-06 (4th Cir.1995); see also Edwards v. City of Goldsboro, 178 F.3d 231, 247 (4th Cir. 1999).
The majority’s narrow focus is thus out of step with decisions of the Supreme Court, of our own court, and of our sister circuits, which have consistently found that employers are not required to ignore the intemperate tone or confrontational manner in which employees may choose to express themselves. See, e.g., Craven v. University of Colorado Hosp. Auth., 260 F.3d 1218, 1228-29 (10th Cir.2001) (relying on abrasive, offensive manner of employee’s speech); Leary v. Daeschner, 228 F.3d 729, 738 (6th Cir.2000) (noting disruptive manner of teachers’ speech, including yelling at colleagues and consistently questioning the principal’s authority); Hansen v. Soldenwagner, 19 F.3d 573, 577 (11th Cir.1994) (“Here, the outcome of a Pickering balance is especially uncertain because the manner of Hansen’s speech was vulgar, insulting, and defiant.”); Germann v. City of Kansas City, 776 F.2d 761, 764-65 (8th Cir.1985) (discussing harsh and distrustful tone of employee’s letter as important factor in Pickering balancing); McBee v. Jim Hogg County, Tex., 730 F.2d 1009, 1017 (5th Cir.1984) (en banc) (considering whether employee’s speech was “sufficiently hostile, abusive or insubordinate as to *797 disrupt significantly the continued operation of the [employer’s] office”).
It makes little sense to consider whether the substance df Love-Lane’s speech harmed morale, close working relationships, or institutional efficiency, and yet not consider whether her tone or manner did precisely the same thing. “[T]he employing agency’s institutional efficiency may 'be threatened not only by the content of the employee’s message but also by the manner, time, and place in which it is delivered.” Givhan v. Western Line Consolidated School Dist., 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). How one says something, in addition to simply what one says, can undermine the morale and close working relationships essential to a productive workplace.
Of the dozens of witnesses whose statements appear in the record, not a single member of Lewisville’s administration or the school system’s central office says that Love-Lane acted professionally. As a result, the majority relies primarily on Love-Lane’s own assertions that she never acted unprofessionally, but Love-Lane’s assertions are entirely unsupported by the record. Four investigations of the Anderson incident concluded that Love-Lane had acted unprofessionally; her principal and the faculty had been alienated by a series of incidents having nothing to do with race; and of course every administrator who intervened at Lewisville, regardless of their gender or race, found Love-Lane’s tone and demeanor inappropriately hostile. The majority does not dispute any of this evidence; it simply ignores it.
The majority instead repeatedly points out that this case arises on a motion for summary judgment. See ante at 775, 777, 778, 779-781, 782. And on that, we certainly agree. In ignoring the wealth of undisputed facts, however, the majority accords little respect to the record or to the views of school administrators. See, e.g., Connick, 461 U.S. at -151-52, 103 S.Ct. 1684 (according “a wide degree of deference” to school officials’ views). Only by failing to consider the way in which Love-Lane spoke can the majority avoid what was obvious to the school system’s, administrators and to the district court: that the manner in which Love-Lane expressed herself served to “disrupt [Lewisville], undermine [Blanchfield’s] authority, and destroy close working relationships.” Con-nick, 461 U.S. at 154, 103 S.Ct. 1684.
C.
Thirdly and finally, the majority cannot demonstrate that Love-Lane’s speech was a substantial factor in her reassignment. None of the evidence marshalled by the majority establishes that Love-Lane was targeted as a result of her stance on allegedly discriminatory practices. See ante at 780-781. Blanchfield did lower Love-Lane’s evaluations over time, particularly in the area of communication skills, but that was because Love-Lane had increasingly clashed with members of the faculty. And Blanchfield did consider Love-Lane’s “continued vocal opposition to [Lewis-ville’s] implementation of the Time-Out Room as blatant disrespect for [Blanch-field] ... and [Lewisville’s] School Improvement Team.” Yet Love-Lane was protesting a program that Blanchfield individually and the faculty collectively had approved. It had been operating for two years as a result of the combined efforts of teachers, parents, and administrators. By this point, Blanchfield might reasonably expect that a member of her own administrative team stop openly attacking a program that she, the faculty, and the local community had supported. Blanchfield was upset with Love-Lane not for the substance of her views, which might well *798 have been communicated in any number of constructive ways. Rather, Blanchfield was upset that Love-Lane seemed intent on continually and confrontationally undermining Blanchfield’s authority with her own staff and the local community.
Regardless, focusing on the disputes between Blanchfield and Love-Lane misses the real point. None of this evidence demonstrates that Martin retaliated against Love-Lane for her speech. While Martin did consider Blanchfield’s evaluations of Love-Lane, he also considered all of the incidents on which those evaluations were predicated: the investigations into the altercation with Angie Anderson, the reports of Montaquila and Bell, the grievance filed by the fifth-grade teachers, and his own first-hand observations of Love-Lane’s attitude and demeanor. None of these incidents related to Love-Lane’s protest against allegedly discriminatory practices. They related instead to Love-Lane’s and Blanchfield’s unfortunate personality conflict — a conflict which, to repeat, was resolved evenhandedly by removing from Lewisville both of the offending parties.
III.
Whether Love-Lane has any viable claim under Pickering for retaliatory demotion is thus far from certain. The bulk of Love-Lane’s speech did not involve matters of public concern; the school system’s interest in the efficient administration of Lewisville was substantial and entitled to deference; and Martin possessed ample grounds for reassigning Love-Lane that had absolutely nothing to do with her speech on racial issues. Yet even assuming that Love-Lane has established a free speech claim, her claim is hardly so clearly established that Martin should have known he was acting unlawfully when he reassigned her.
My friends in the majority, however, would strip Martin even of qualified immunity. This is incorrect. It was quite reasonable for Martin to conclude that Love-Lane’s “interest in First Amendment expression” did not outweigh the school system’s “interest in efficient operation of the workplace.” Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 352 (4th Cir.2000) (quoting Hanton v. Gilbert, 36 F.3d 4, 6-7 (4th Cir.1994)). “Just as an employee has a right to speak — even at work — public employers have the right to run efficient, functional operations.” Id. at 351. This is especially true since “only infrequently will it be clearly established that a public employee’s speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a particularized balancing that is subtle, difficult to apply, and not yet well-defined.” DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir.1995) (internal quotations omitted).
The district court properly found that the difficult balance sought here — measuring Love-Lane’s free speech interest against the school district’s interest in the efficient operation of its schools — was anything but clearly established. While “ ‘there need not be a prior case directly on all fours with the facts presented to the official,’ ” it must be clear that “in light of pre-existing law, the unlawfulness of the challenged action was apparent to the official.” Cromer v. Brown, 88 F.3d 1315, 1325 (4th Cir.1996) (quoting Pinder v. Johnson, 54 F.3d 1169, 1173 (4th Cir. 1995)).
Yet pre-existing law supported the legality of Martin’s decision. The disrup-tiveness of Love-Lane’s conduct gave Martin every reason to believe that the Pickenng balance swung in the school system’s favor. Indeed, what the majority deems clearly established is actually a *799 sharp departure from our precedents. For instance, in Cromer we denied qualified immunity to a sheriff who had allegedly retaliated against a deputy for protesting racial discrimination within the sheriffs department. Cromer, 88 F.3d at 1331. The deputy was one of over thirty minority law enforcement officers who had slipped a private letter alleging racial discrimination under the sheriffs door. Id. at 1320 & n. 2. In performing the Pickering balancing test, we specifically relied upon the fact that the officers’ concerns “were presented in a non-confrontational way that did not appreciably affect the sheriffs efficiency interests.” Id. at 1330 n. 11. Here, in contrast, Love-Lane’s concerns were presented in a confrontational way that disrupted Lewisville and soured working relationships with Blanchfield, Martin, Montaquila, Bell and much of Lewisville’s faculty.
In short, at the time Martin decided to reassign Love-Lane in 1998, prior cases would not have given him any reason to believe that he was acting unlawfully— much less that his unlawfulness was clearly established. The Supreme Court’s prior case law, not to mention our own, did not require Martin to ignore reports of obscenity-laden shouting matches in Lewisville’s hallways; widespread complaints from his teachers, and indeed his own subordinates, about Love-Lane’s unprofessional manner; and evidence of a bitter feud between members of Lewisville’s administrative team. Had Martin done nothing, and allowed the situation at Lewisville to deteriorate further, he would have been an ineffectual school superintendent.
One cannot help but wonder what the majority would now require of superintendents like Martin. All told, Martin waited for two years, conducted innumerable conferences and investigations, and personally involved himself in attempts at improvement, while the situation at Lewisville steadily declined despite his efforts. What exactly are school administrators in Martin’s shoes henceforth supposed to do? The majority notes vaguely that they should “hear out” someone’s “concerns,” ante at 784-785, but that is exactly what Martin did — not just once, but over and over and over again. Administrators like Martin may be forgiven, then, for doubting that they “will not be hindered by today’s decision.” Ante at 785. Because the Pickering balance is itself uncertain, the denial of qualified immunity to the defendant leaves school administrators in a sea of indeterminacy. The majority has reached the point where litigation outcomes are so uncertain, that the prospect of liability deprives those in positions of responsibility of the chance to take steps that may demonstrate educational leadership and earn a community’s respect.
IV.
The majority’s decision thus deals public education a double blow. It not only strikes the Pickering balance against school principals and superintendents, but denies them qualified immunity as well. It ought not be necessary to catalog the harms done to public education by the majority’s one-two punch, except that the majority disavows that its decision will do any such harm. See ante at 784-785. In fact, stripping Martin of qualified immunity for his decision to reassign a pair of squabbling administrators begins by harming our circuit’s superintendents, whose reasonable personnel decisions will now increasingly be the subject of federal lawsuits. But it ends by harming our circuit’s children and teachers, who depend on strong administrators for collegial and orderly schools that produce lessons rather than lawsuits.
*800 As I have explained, I believe that this case involves little more than a poisonous personality conflict. The majority believes something else. According to the majority, this case is not about Love-Lane’s inability to get along with others; it is instead about Love-Lane’s outspoken opposition to a disciplinary program that had been approved by Lewisville’s parents, teachers, and administration. See ante at 775. If we take the majority on its own terms, we ought indeed to be troubled. There is no question that Love-Lane had the opportunity to voice her objections, which simply did not persuade others at Lewisville. And there is no question that Love-Lane could have made valuable contributions to life and disciplinary practice at Lewisville in any number of constructive ways. But communities like Lewisville should be able to implement their disciplinary decisions, without the unremitting opposition of the very administrators charged with carrying out those decisions. Instead, localities will now find their efforts at disciplinary improvement the subject of litigation.
As any school teacher knows, this is regrettable. Keeping order in our nation’s schools is among our most pressing educational concerns. See, e.g., New Jersey v. T.L.O., 469 U.S. 325, 339, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (“Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems.”); People v. Pruitt, 278 Ill.App.3d 194, 214 Ill.Dec. 974, 662 N.E.2d 540, 545 (1996) (“We long for the time when children did not have to pass through metal detectors on their way to class, when hall monitors were other children, not armed guards, when students dressed for school without worrying about gang colors.”). Sadly, almost half of America’s teachers report that they spend more time trying to keep order in their classrooms than actually teaching students. See Jean Johnson & Ann Duffett, Public Agenda, Where We Are Now: 12 Things You Need to Know About Public Opinion and Public Schools 16 (2003).
Of course, a breakdown in order and discipline leaves teachers unable to educate and students unable to learn. See, e.g., T.L.O., 469 U.S. at 350, 105 S.Ct. 733 (Powell, J., concurring) (“Without first establishing discipline and maintaining order, teachers cannot begin to educate their students.”). And yet the consequences stretch far beyond missed opportunities for learning, because the more severe a school’s disciplinary problems are, the more likely it is that the school’s students will be victims of violent or even extremely violent encounters. See Amanda K. Miller & Kathryn Chandler, U.S. Department of Education, Violence in U.S. Public Schools: 2000 School Survey on Crime and Safety 20 (2003). It is not difficult to understand, then, why an overwhelming number of Americans believe that the lack of student discipline is a serious problem in their local schools. See Johnson & Duf-fett, Where We Are Now at 26.
The majority is unwilling to trust the efforts of public school systems to bring about disciplinary improvement. It places its bet not on the ability of communities to devise their own solutions to disciplinary problems, but on litigation that serves to undercut those very same solutions. The majority’s unwillingness to allow communities to recognize problems and address them through the medium of democracy does serious harm to public education. It siphons off educational efforts into depositions and scarce educational dollars into attorneys’ fees. It places accountability in the courts rather than in school boards and the administrators answerable to them. “Returning schools to the control of local authorities at the earliest practicable *801 date is essential to restore their true accountability in our governmental system.” Freeman v. Pitts, 503 U.S. 467, 490, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). To be sure, democratic processes are robust and sometimes produce decisions that do not please everyone. Yet to displace democracy too readily with judicial supervision is to discourage joint and voluntary efforts at improvement and ultimately to miss out on the more generous possibilities of America.
The majority disclaims the novelty of its approach, as if its opinion were nothing more than a routine application of Pickering and its progeny. See ante at 785, 789. With all respect, this is simply not the case. We have never accorded so little deference to the views of - public school administrators or such short shrift to well-established principles of qualified immunity. Under the majority’s regime, courts, not schools themselves, will have the final word on questions of school discipline. And with lawsuits waiting in the wings, principals and superintendents will be reluctant to do their part in resolving disciplinary problems or in reconstituting dysfunctional administrative teams.
But nowhere will the effects of this litigation be felt more severely than on the ability of educators to set expectations for their students. Only by establishing such expectations can schools bring out the best in children and give them every chance at success. But setting expectations requires order in public school systems and strong working relationships between public school officials. It requires that school authorities be able to set reasonable goals for their local administrators, who in turn set standards for the students they are charged with educating. In short, expectations for an orderly environment go hand-in-hand with expectations for a creative and productive learning- experience. To have litigation at every turn is the surest way to undercut the standards that challenge students and the expectations that form the essence of education itself.
V. .
In the final analysis, even if we disagree with Martin’s personnel actions, his educational philosophy, his view of school discipline, or his feelings about the need for cooperative relations at the head of a school within his district, that is a far cry from saying that he violated clearly established federal law. In holding that he did, my fine colleagues have made a serious mistake.
Martin, like most teachers, principals, and superintendents, presumably entered the public school system to educate children, not to engage in the debilitating litigation that this lawsuit has come to represent. If decisions like Martin’s are going to sow the seeds of federal actions, school administrators will- either be cowed into inaction or they will seek the greener pastures of private schools, where education, not litigation, remains the top priority. I am well aware that many children “do[] not have the option of going to a private school or somewhere else,” ante at 786, but the teachers and principals who educate them do — and the majority is chasing them from public schools.
That is a shame, because public education represents something quite special in this country — the opportunity for Americans of all races and ethnicities and backgrounds to prepare together for the challenges and responsibilities of citizenship. Public school systems deserve the best this nation has to offer.. But the best educators have other opportunities, both within education and without, and the inability to pursue learning without lawsuits is driving them away from where America needs them most. To eviscerate the doctrine of qualified immunity, as the majority has *802 done here, is to subject public schools uniquely to the omnipresent spectre of litigation, to the detriment of the children and communities they were intended to serve. I commend and would affirm the judgment of the district court.