[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11418

_____

DR. JASMINE YOUNGE,

                                        Plaintiff-Appellant,

*versus*

FULTON JUDICIAL CIRCUIT DISTRICT ATTORNEY'S OFFICE, GEORGIA,

                                        Defendant-Appellee,

PAUL L. HOWARD, JR.,
Fulton County District Attorney; in his individual capacity,

                                        Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-00684-WMR

_____

Before BRANCH, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, on its own terms, does not extend its protections to elected officials or their "personal staff." 42 U.S.C. § 2000e(f).[1] And in Georgia, district attorneys are elected officials. Yet after Jasmine Younge, who was third-in-command of the Fulton County District Attorney's Office ("the DA's Office"), brought this Title VII suit against her employer,[2] the DA's Office failed to raise Title VII's personal-staff exemption until after discovery closed. The DA's Office did not "realize[] this was an issue" until it began preparing its motion for summary judgment.

_____

[1] Under Title VII, an "employee" does not include "any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff." 42 U.S.C. § 2000e(f).

[2] Paul L. Howard, Jr. served as Fulton County DA at all relevant times. He, however, is not a party to this appeal in either his personal or official capacity. In this opinion, we refer to both the DA's Office (as an entity and party) and Howard (as a person) where relevant.

The district court allowed the DA's Office to assert the personal-staff exemption for the first time as an affirmative defense at summary judgment because the court found that Younge was not prejudiced by the DA's Office's failure to timely plead that defense. The district court then granted summary judgment to the DA's Office after finding that Younge was a member of Howard's personal staff.

Younge appeals that decision and argues (1) that the district court should have applied a good-cause standard, not a prejudice standard, to determine whether the DA's Office could assert an unpleaded affirmative defense at summary judgment; (2) that the DA's Office's late defense prejudiced her; and (3) that she was not a member of Howard's personal staff by the time she was fired.

This appeal requires us to decide whether the district court properly considered the DA's Office's belated defense when it granted summary judgment to the DA's Office based on the personal-staff exemption. After careful review, and with the benefit of oral argument, we affirm.

## I.     Background

In April 2019, Howard hired Younge as Deputy Chief of Staff and Director of Policy and Programs of the DA's Office at a salary of $120,282. Howard initially tried to hire Younge as a Director at a salary of $125,000, but Fulton County did not allow him to hire Younge at that title and salary combination. Howard made Younge's formal title "Deputy Chief of Staff" to allow him to pay a salary close to the $125,000 that Younge had requested. Younge's

offer letter specified that she would "be assigned to the Policy Division under the supervision of the District Attorney," and her offer was "contingent upon the approval of the Fulton County Personnel Department and Finance Department."

Younge began working for the DA's Office the next month. Younge's job description stated that she would oversee "policy implementation and development, management and oversight of bureaus, strategic communications, and responsive constituent services." Her job description also provided that she would be the principal writer of criminal justice and crime prevention policies and programs, and she would develop, implement, and administer the programs.[3]

While Younge worked for the DA's Office, she was third-in-command after Howard and his Chief of Staff, Lynne Nelson. Younge supervised more than thirty employees and fifteen to twenty different policies and programs implemented by the DA's Office. In so doing, Younge testified that she frequently met with dignitaries, community leaders, and members of the public who visited the DA's Office. Howard also attended these meetings.

In carrying out her duties, Younge and Howard worked closely together. Howard was Younge's only supervisor, and the two discussed Younge's work and programs every day. Howard even sent Younge messages on the weekends. As Younge averred,

---

[3] Younge contends that her predecessor created most of the programs she worked on, meaning she merely ran the programs.

Howard "demanded constant availability around the clock" from her. Younge testified that her schedule was "pretty much the schedule that . . . Howard had." Howard averred that he closely supervised Younge's work because voters would judge him based on how Younge interacted with the public and implemented policies and projects on behalf of the DA's Office. If Howard "needed something done[,] [Younge] would handle it." Younge was "always in and out" of Howard's office because she was one of "the essential folks" in the DA's Office. Younge testified that she was "literally [Howard's] go-to person for almost everything," and was "one of the few on staff that was just able to just walk into his office at any time." Howard similarly testified that Younge was "a key member" and "a high ranking part" of the DA's Office.

Around July 1, 2019, approximately two months after she started her job, Younge told Howard that she was pregnant. Afterwards, Howard stopped meeting with Younge, excluded her from his meetings with others, treated her dismissively, and reassigned some of her work duties. Two weeks later, he fired Younge.

Following her termination, Younge sued the DA's Office for, in relevant part, pregnancy discrimination in violation of Title VII.[4] In its answer, the DA's Office asserted several affirmative

---

[4] Younge's complaint also alleged claims for retaliation in violation of Title VII, race discrimination in violation of Title VII, race discrimination in violation of 42 U.S.C. § 1981, and gender-based discrimination in violation of the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. § 1983. On the DA's Office's motion to dismiss, the district court dismissed all of

defenses but did not assert that Younge was "personal staff" of an elected official exempt from Title VII's protections.[5]  On March 14, 2022, after discovery had closed, the DA's Office notified Younge and the district court of its intent to raise the personal-staff exemption at summary judgment.  Two months later, the DA's Office moved for summary judgment and argued that Younge was part of Howard's "personal staff" exempt from Title VII's protection.  Younge opposed summary judgment and argued that the DA's Office could not belatedly raise this affirmative defense absent good cause.

After oral argument on the DA's Office's motion for summary judgment, a magistrate judge issued a report and recommendation ("R&R") finding that the DA's Office could assert the personal-staff exemption as a belated affirmative defense because the late assertion would not prejudice Younge.  Then, the magistrate judge recommended summary judgment in favor of the DA's Office because there was no genuine dispute of material fact that Younge was part of Howard's personal staff.

Over Younge's objections, the district court agreed that the DA's Office could assert the personal-staff exemption as an

Younge's claims except for pregnancy discrimination and retaliation under Title VII.  At summary judgment, Younge abandoned her retaliation claim.  Accordingly, Younge's pregnancy-discrimination claim under Title VII is her sole remaining claim.

[5] Neither party disputes that the district attorney for a judicial circuit is an elected position in Georgia.  *See* O.C.G.A. § 15-18-3(1).

affirmative defense and that the DA's Office was entitled to summary judgment because of this defense. Accordingly, the district court granted summary judgment to the DA's Office. Younge timely appealed.

## II.     Discussion

Younge argues that the district court erred by (1) applying a prejudice standard to determine whether the DA's Office could assert an unpleaded affirmative defense at summary judgment; (2) finding that the DA's Office's late defense did not prejudice her; and (3) finding that she was a member of Howard's personal staff. We address each issue in turn.

### A.     *We assume without deciding that the personal-staff exemption is an affirmative defense*

As relevant here, Title VII provides that an employer may not "discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII does not define the term "any individual," but "we have held that only those plaintiffs who are 'employees' may bring a Title VII suit." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1242 (11th Cir. 1998). Title VII defines "employee" to mean "an individual employed by an employer, except that the term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen

8                       Opinion of the Court                    23-11418

by such officer to be on such officer's personal staff."  42 U.S.C.
§ 2000e(f).

We have never addressed whether Title VII's exemptions to
employee status are affirmative defenses or elements of a plaintiff's
*prima facie* case.  Our sister circuits that have addressed the question
have come to different conclusions.   In the Fourth Circuit,
"employee status is an element of a substantive Title VII claim"
which defendants can challenge "by a motion under Fed. R. Civ. P.
12(b)(6) for failure to state a claim."  *Curl v. Reavis*, 740 F.2d 1323,
1327 n.2 (4th Cir. 1984).  But in the Fifth Circuit, the personal-staff
exemption is an affirmative defense because it "allows the
defendant to avoid liability even if the plaintiff meets his burden of
proof under Title VII."  *Oden v. Oktibbeha Cnty.*, 246 F.3d 458, 467
(5th Cir. 2001).  This difference matters because it changes which
party must include the exemption in its pleadings.  *See* Fed. R. Civ.
P. 8(a)(2), (b)(1)(A).

We need not decide this issue today, however, because the
parties have fully litigated this case as if the personal-staff
exemption is an affirmative defense.  The magistrate judge agreed
with the Fifth Circuit and recommended treating the personal-staff
exemption as an affirmative defense.  The DA's Office did not
object to that recommendation.  The district court treated the
personal-staff exemption as an affirmative defense, and the DA's
Office does not appeal that holding.  Indeed, the DA's Office argues
to us on appeal that we need not decide this question and treats the
personal-staff exemption as an affirmative defense in its brief.

Accordingly, we assume without deciding that Title VII's personal-staff exemption is an affirmative defense.

> B.    *A district court may consider a defendant's unpleaded affirmative defense at summary judgment if there is no prejudice to the plaintiff*

The district court determined that it could consider the DA's Office's personal-staff defense because Younge was not prejudiced by the DA's Office's failure to timely plead that defense. Younge argues that this determination was error because the DA's Office failed to show good cause for not timely pleading the personal-staff exemption. The DA's Office responds that the district court correctly considered whether Younge was prejudiced by the DA's Office's failure to timely plead the personal-staff exemption.

We review a district court's ruling on waiver of affirmative defenses for abuse of discretion. *See E.E.O.C. v. White & Son Enters.*, 881 F.2d 1006, 1009 (11th Cir. 1989). A district court abuses its discretion when it applies an incorrect legal standard, relies on clearly erroneous factual findings, or commits a clear error of judgment. *Bradley v. King*, 556 F.3d 1225, 1229 (11th Cir. 2009).

Generally, Federal Rule of Civil Procedure 8(c) requires a party to "affirmatively state any avoidance or affirmative defense" when "responding to a pleading." Fed. R. Civ. P. 8(c)(1). We have explained the consequences of failing to comply with Rule 8(c):

> [T]he general rule is that, when a party fails to raise an affirmative defense in the pleadings, that party waives its right to raise the issue at trial. However,

10                    Opinion of the Court                    23-11418

the liberal pleading rules established by the Federal Rules of Civil Procedure apply to the pleading of affirmative defenses. . . .  When a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice.  And, when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue.

*Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988) (internal citation omitted).  Since *Hassan*, we have repeatedly reaffirmed that a district court may receive evidence of an unpleaded affirmative defense if the plaintiff was not "prejudiced" by the defendant's failure to plead the defense in its answer.  *See, e.g.*, *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1221–22 (11th Cir. 2012) (holding that "[t]he district court did not abuse its discretion in allowing [the defendant] to raise" an affirmative defense "a month and a half before trial in a motion for summary judgment" because the plaintiff "ha[d] not suggested that it suffered any prejudice from the delay in asserting the defense"); *Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1350–52 (11th Cir. 2007) (holding that "the district court erred in excluding evidence" concerning an affirmative defense because the plaintiff "had notice of [the affirmative defense] and was not prejudiced"); *Miranda de Villalba v. Coutts & Co. (USA) Int'l*, 250 F.3d 1351, 1353 (11th Cir. 2001) (holding that at summary judgment, "[a] court may consider an affirmative defense that did not appear in the answer, if the

plaintiff has suffered no prejudice from the failure to raise the defense in a timely fashion"); *Grant v. Preferred Rsch., Inc.*, 885 F.2d 795, 797–98 (11th Cir. 1989) ("When there is no prejudice, the trial court does not err by hearing evidence on [an affirmative defense]."); *see also Mitchell v. Jefferson Cnty. Bd. of Educ.*, 936 F.2d 539, 544 (11th Cir. 1991); *Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548, 1551 (11th Cir. 1991).

The DA's Office did not plead the personal-staff exemption in its answer. Accordingly, we next consider whether the DA's Office prejudiced Younge by asserting the personal-staff exemption after discovery closed. *See Hassan*, 842 F.2d at 263.

C.    *The DA's Office did not prejudice Younge by belatedly asserting the personal-staff exemption*

The district court, over Younge's objection, determined that Younge did not suffer any prejudice arising from the DA's Office's late reliance on the personal-staff exemption. On appeal, Younge argues that consideration of the DA's Office's unpleaded affirmative defense prejudiced her because Younge "was denied the opportunity to conduct purposeful discovery on" the personal-staff exemption.

We review a district court's ruling on waiver of an affirmative defense for abuse of discretion. *See White & Son Enters.*, 881 F.2d at 1009. In *Hassan*, we held that "there was no prejudice" to the plaintiff arising from the defendant's unpleaded affirmative defense. 842 F.2d at 263. We reached that conclusion because, during discovery, the defendant deposed the plaintiff and

"questioned her extensively" about facts pertaining to the affirmative defense before the defendant first asserted the defense at trial. *Id.* The defendant also asked the plaintiff about facts underlying the affirmative defense in an interrogatory. *Id.* Thus, the defendant's unpleaded affirmative defense did not "unfairly surprise[] or prejudice[] the plaintiff." *Id.* at 264.

Here, the district court similarly determined that Younge was not prejudiced because "discovery focused on matters highly relevant to the 'personal staff' exemption." As we will discuss further below, courts consider six factors when determining if an individual is on an elected official's personal staff. *See Laurie v. Ala. Ct. of Crim. Appeals*, 88 F. Supp. 2d 1334, 1338 (M.D. Ala. 2000), *aff'd*, 256 F.3d 1266 (11th Cir. 2001). And here, as we will detail, the record contains copious discovery evidence concerning each of the six factors. Thus, "we cannot say that the [DA's Office's] argument unfairly surprised or prejudiced" Younge. *Hassan*, 842 F.2d at 263–64.[6]

Tellingly, Younge never moved to reopen discovery despite the magistrate judge's willingness to do so. Both below and on appeal, Younge has attempted to identify more discovery she would have sought if the DA's Office timely pleaded this defense.

---

[6] We also note that Younge conceded below that the DA's Office's discovery responses made "five references to [Younge] being a member of Howard's 'personal staff.'" That concession bolsters our conclusion that Younge was not "unfairly surprised or prejudiced" by the personal-staff exemption. *Hassan*, 842 F.2d at 263–64.

23-11418                Opinion of the Court                13

But we cannot credit Younge's argument that she suffered prejudice when she rejected the magistrate judge's invitation to seek more discovery.[7]    Accordingly, the district court did not clearly err by finding that Younge had not suffered prejudice from the DA's Office's late assertion of the personal-staff exemption.[8]

---

[7] For example, Younge proposed to identify, subpoena, and depose various members of the public to gauge their opinion on whether they believed Younge represented Howard.    Younge, however, failed to identify any particular people she would have sought to depose, so we agree with the R&R that this discovery would be a "mere fishing expedition."    Moreover, Younge proposed further discovery on Fulton County's regulations governing Howard's ability to hire staff.    But discovery about regulations and how they apply is legal research, not fact discovery.

[8] In opposition to this conclusion, Younge cites Federal Rules of Civil Procedure 15 and 16 and a separate line of our cases applying a good-cause standard to late motions to amend pleadings, and she argues that the good-cause and prejudice standards conflict in this case.    We find no such conflict: we simply treat unpleaded affirmative defenses differently from late motions to amend pleadings.    The former requires a showing of no prejudice, while the latter requires a showing of good cause.    *Compare, e.g.*, *Grant*, 885 F.2d at 797–98 ("When there is no prejudice, the trial court does not err by hearing evidence on [an unpleaded affirmative defense]."), *with, e.g.*, *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418–19 (11th Cir. 1998) ("[B]ecause Sosa's motion to amend was filed after the scheduling order's deadline, she must first demonstrate good cause under Rule 16(b) before we will consider whether amendment is proper under Rule 15(a).").    Each of the cases Younge cites in which we applied the good-cause standard were late-amendment cases governed by Rules 15 and 16, not unpleaded-affirmative-defense cases.    In other words, in each of the cited cases, a party affirmatively moved to amend a pleading instead of—as the DA's Office did here—raising an affirmative defense without amendment.    *See, e.g.*, *Haynes v. McCalla Raymer, LLC*, 793 F.3d 1246, 1250 (11th Cir. 2015); *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1287 (11th Cir. 2003).    As discussed, under the rule that squarely governs this case,

14                    Opinion of the Court                    23-11418

We next turn to whether Younge was a member of Howard's personal staff.

### D.    *Application of the personal-staff exemption*

The district court determined that Younge was on Howard's personal staff. Thus, the district court granted summary judgment to the DA's Office. On appeal, Younge argues that the district court did not view the evidence in the light most favorable to her, and that genuine disputes of material fact exist concerning her status as a member of Howard's personal staff. The DA's Office responds that the evidence is "overwhelming" that Younge was on Howard's personal staff.

"We review *de novo* a district court's grant of summary judgment, applying the same standard as the district court." *Snell v. United Specialty Ins. Co.*, 102 F.4th 1208, 1214 (11th Cir. 2024) (quotation omitted). "Namely, summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). Our job is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence

---

Younge suffered no prejudice. *See Hassan*, 842 F.2d at 263–64; *Grant*, 885 F.2d at 797–98.

favoring the nonmoving party for a jury to return a verdict for that party.'" *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249), *abrogated in part on other grounds by White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009). "In applying this standard, the court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor." *Snell*, 102 F.4th at 1214.

> 1.    We assume without deciding that the *Laurie* factors govern our analysis

We have never addressed, in a published decision, how to decide whether an individual was on an elected official's "personal staff" under Title VII. But in *Laurie v. Alabama Court of Criminal Appeals*, the United States District Court for the Middle District of Alabama considered six factors to evaluate whether the plaintiff was on the defendant's personal staff:

> (1) Whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual

> intimacy of the working relationship between the elected official and the person filling the position.

88 F. Supp. 2d at 1338 (alteration adopted) (quotation omitted). We affirmed the district court on this issue "on the basis of the district court's well-reasoned opinion." 256 F.3d at 1269.

Generally, an affirmance without opinion "does not necessarily adopt the reasoning of the district court; it merely holds that the judgment is not erroneous." *In re Gen. Coffee Corp.*, 828 F.2d 699, 703 (11th Cir. 1987); *see United States v. Cerceda*, 172 F.3d 806, 812 n.6 (11th Cir. 1999) (*en banc*). When we adopt the reasoning of a district court on an issue, we do so specifically and explicitly. *See, e.g.*, *Bodine v. Fed. Kemper Life Assurance Co.*, 912 F.2d 1373, 1376–77 (11th Cir. 1990) ("We agree with the district court's conclusion and adopt the following portion of its reasoning: . . . ."); *Wiggins v. Warrior River Coal Co.*, 696 F.2d 1356, 1359 (11th Cir. 1983) ("In so holding, we adopt the following reasoning of the district court judge: . . . .").

In *Laurie*, we split the baby. We did not merely affirm without opinion; we affirmed "on the basis of the district court's well-reasoned opinion." 256 F.3d at 1269. But this line is also not the specific, explicit adoption of the district court's reasoning that we typically employ. Thus, we question whether the *Laurie* district court's six-factor test binds us when deciding the applicability of the personal-staff exemption.

But we leave that question for another day. Below, the parties litigated the personal-staff exemption using *Laurie*'s six-

factor test, and the district court applied *Laurie*'s six-factor test when it granted summary judgment to the DA's Office. Neither party appeals the district court's use of that test. Indeed, both parties continue to litigate the personal-staff exemption using the *Laurie* six-factor test in their briefing before us. Accordingly, we assume without deciding that *Laurie*'s six-factor test is the proper standard to determine whether an individual was on an elected official's personal staff under Title VII. *See Laurie*, 88 F. Supp. 2d at 1338 (listing the six factors).

> 2. There is no genuine dispute of material fact that Younge was on Howard's personal staff

We now turn to whether Younge was on Howard's personal staff. As discussed, we will apply *Laurie*'s six-factor test to answer this question. Again, those six factors are:

> (1) Whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

*Id.* (alteration adopted) (quotation omitted). Courts construe the personal-staff exemption "narrowly." *Teneyuca v. Bexar Cnty.*, 767 F.2d 148, 152 (5th Cir. 1985). Younge argues that she has demonstrated a genuine dispute of material fact concerning factors (1), (3), and (6); thus, summary judgment for the DA's Office is inappropriate. Younge concedes that factors (2), (4), and (5) weigh in favor of applying the personal-staff exemption. Because our review is *de novo*, we take each of the factors in turn.

> a.    *The first factor, plenary powers of appointment and removal, is neutral*

The district court found that this factor was neutral because Howard had plenary power to remove Younge but not to appoint her. Younge argues on appeal that this factor "weighs against applying the Exemption" because Howard "did not have 'plenary' powers of appointment." Younge's argument fails.

We have explained that the "Georgia statutory code expressly empowers the District Attorney to hire and discharge personnel and to 'define the duties and fix the title of any attorney or other employee of the district attorney's office.'" *Peppers v. Cobb Cnty.*, 835 F.3d 1289, 1299 (11th Cir. 2016) (quoting O.C.G.A. § 15-18-20(a)). Specifically, under Georgia law,

> [t]he district attorney in each judicial circuit may employ such additional assistant district attorneys, deputy district attorneys, or other attorneys, investigators, paraprofessionals, clerical assistants, victim and witness assistance personnel, and other

> employees or independent contractors as may be provided for by local law or as may be authorized by the governing authority of the county or counties comprising the judicial circuit.

O.C.G.A. § 15-18-20(a). Moreover, Georgia law empowers "[t]he district attorney [to] define the duties and fix the title of any attorney or other employee of the district attorney's office." *Id.* Finally, Georgia law empowers district attorneys to fire personnel, although compensation is determined by the relevant counties:

> Personnel employed by the district attorney pursuant to this Code section shall serve at the pleasure of the district attorney and shall be compensated by the county or counties comprising the judicial circuit, the manner and amount of compensation to be paid to be fixed either by local Act or by the district attorney with the approval of the county or counties comprising the judicial circuit.

*Id.* § 15-18-20(b).

This statutory framework demonstrates that Howard had plenary power to terminate Younge. *See, e.g., E.E.O.C. v. Reno*, 758 F.2d 581, 584–85 (11th Cir. 1985) (holding that Florida assistant state attorneys were exempted "personal staff" of the state attorney under the Age Discrimination in Employment Act's personal-staff exemption, in relevant part, because "the assistant state attorneys serve at the pleasure of the appointing state attorney"). Howard could also hire candidates, but his hiring power was circumscribed

by "local law or as . . . authorized by the governing authority of the county or counties comprising the judicial circuit." O.C.G.A. § 15-18-20(a). Indeed, Younge's offer letter explained that her offer was "contingent upon the approval of the Fulton County Personnel Department and Finance Department." Younge testified that Howard initially hired her to a director position but had to change her title to "deputy chief of staff . . . so that [the DA's Office] could get the salary that [Younge] had requested." Thus, Howard had plenary power to terminate Younge but more limited power to appoint her. Accordingly, we agree with the district court that, when viewing this evidence in the light most favorable to Younge, this factor is neutral.

In opposition to this conclusion, Younge argues that "the factor is not phrased as 'whether the elected official has plenary powers of appointment <u>or</u> removal,' such that plenary power in <u>either</u> area qualifies. It is phrased as 'plenary powers of appointment <u>and</u> removal.'" (emphasis in original) (quoting *Teneyuca*, 767 F.2d at 151). Thus, according to Younge, this factor weighs against applying the personal-staff exemption because Howard did not have *both* plenary powers. But "[t]he language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)); *see also Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) ("[J]udicial opinions are not statutes, and we don't dissect them word-by-word as if they were."). The *Laurie* factors are judicially created; they are not in the governing statute.

*See* 42 U.S.C. § 2000e(f).  And the Fifth Circuit has observed that whether an individual falls within the personal-staff exemption is a "highly factual" inquiry, and the six identified factors are "not intended to be exhaustive." *Teneyuca*, 767 F.2d at 152.  Thus, we decline to disregard Howard's plenary power to terminate Younge simply because his power to appoint was more limited. Accordingly, the district court properly held that this factor was neutral.

> b.    *The second factor, sole accountability to the elected official, weighs in favor of applying the exemption*

Younge concedes that this factor weighs in favor of applying the personal-staff exemption.  The record shows that Younge was personally accountable only to Howard.  Younge's offer letter explains that she "will be assigned to the Policy Division under the supervision of the District Attorney."  Younge testified that Howard was her only supervisor.  Howard testified that he was Younge's immediate supervisor.  Younge also testified that she met with Howard every day, she handled anything Howard needed done, she discussed the progress of her work with Howard every day, she had meetings with Howard all the time, and she did not need to make appointments to see Howard because she was "essential" and Howard's "go-to person."  Howard also testified that he supervised members of his staff like Younge "personally and directly."  Howard testified that "Ms. Younge had complete access to [his] office, and so several times a day she would walk into [Howard's] office and usually a conversation early in the morning

was, so [they] would talk about the activities for that day." Accordingly, Younge was personally accountable solely to Howard, so this factor weighs in favor of applying the personal-staff exemption to Younge.

> c.    *The third factor, representation of the elected official to the public, weighs in favor of applying the exemption*

The district court concluded that Younge represented Howard to the public. On appeal, Younge argues that Howard represented himself to the public and removed Younge's public-facing duties before firing her. We find this factor also favors the DA's Office.

When considering this factor, courts generally look to the public-facing nature and responsibilities (or lack thereof) of the plaintiff's job. *See Gunaca v. Texas*, 65 F.3d 467, 471 (5th Cir. 1995); *Montgomery v. Brookshire*, 34 F.3d 291, 295–96 (5th Cir. 1994); *Ramirez v. San Mateo Cnty. Dist. Att'y's Off.*, 639 F.2d 509, 510–13 (9th Cir. 1981); *Laurie*, 88 F. Supp. 2d at 1348. Younge herself testified that she was "in contact with a lot of persons in the community on behalf of the DA's office." She stated that "[a]ny dignitaries or anybody—any visitors that came to the office and had meetings with the DA, [Younge] was in."

This testimony mirrored that of Howard. He testified that Younge, as "the third highest official in our office," would speak for him. Howard also averred that because of Younge's "job duties and her interaction with [Fulton County] constituents, such as the

public, community leaders, and dignitaries, [Younge] represented the DA in the community more than any other member of [Howard's] personal staff." Thus, the record shows Younge represented Howard to the public, just like other DA employees that courts, including us, have considered personal staff. *See, e.g.*, *Shahar v. Bowers*, 114 F.3d 1097, 1104 n.15 (11th Cir. 1997) (*en banc*) (discussing, in the Title VII personal-staff-exemption context, "lawyers who serve at the pleasure of their policy-making chief" and their responsibilities "acting and speaking before others on behalf of the chief"); *Gunaca*, 65 F.3d at 471 (discussing investigators' job functions, "which necessarily involve[] interaction with the public," in holding that "investigators are . . . representatives of the district attorney" under the Age Discrimination in Employment Act's identical personal-staff exemption); *Ramirez*, 639 F.2d at 513 (holding that a deputy district attorney is "personal staff" of the district attorney under Title VII's personal-staff exemption).

Younge resists this conclusion by arguing that Howard represented himself to the public: "[w]henever Younge met with members of the public, Howard was also present," and "Younge did not run any of these meetings." Thus, according to Younge, "the inference that most favors the non-moving party" is that "because Howard was always present in meetings with the public[,] members of the public perceived Howard himself (not Younge) as representing him."

24                     Opinion of the Court                     23-11418

Younge's argument fails.  "In passing upon a motion for summary judgment, a finding of fact which may be inferred but not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists." *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1564 (11th Cir. 1989) (quotation omitted).  Younge cites nothing to support the inference that she asks us to draw.  Just because Howard was present in meetings does not mean that Younge did not *also* speak for Howard, especially when Younge was the third-ranking member of the DA's Office as Deputy Chief of Staff and Director of Policy and Programs.  Indeed, the record demonstrates, largely through Younge's own testimony, that Younge often acted and spoke on Howard's behalf to the public.  For example, Younge stated she had "so many" projects that she "was actually responsible for," which required her to be "in contact with a lot of persons in the community on behalf of the DA's office."  Howard corroborated Younge's testimony.  Given that evidence, Younge's strained inference cannot defeat summary judgment in favor of the DA's Office.  *See Bald Mountain Park, Ltd.*, 863 F.2d at 1564.[9]

---

[9] Younge also argues that this factor weighs against applying the personal-staff exemption to her because Howard effectively demoted Younge by removing her public-facing duties before terminating her.  Younge advances a similar argument concerning the intimacy of her working relationship with Howard. We deal with these arguments together below.

> d. *The fourth factor, the elected official's control over the position, weighs in favor of applying the exemption*

Younge concedes that this factor weighs in favor of applying the personal-staff exemption.  The record supports Younge's concession: Howard set the agenda for the initiatives and programs that Younge worked on.  Howard remained "very involved" in Younge's work; Younge testified Howard was "[a]bsolutely" a "micro manager."  Howard averred that he "was very involved with [Younge's] work because [he] knew that [the] voters would judge [him] based on the job [Younge] did implementing [the DA's Office's] policies and projects."  Younge and Howard testified that they talked about Younge's work every day.  Accordingly, Howard exercised a great deal of control over Younge's work, so this factor weighs in favor of applying the personal-staff exemption.

> e. *The fifth factor, the position in the chain of command, weighs in favor of applying the exemption*

Younge concedes that this factor weighs in favor of applying the personal-staff exemption.  We agree.  Younge was third in the chain of command in the DA's Office.  Younge testified that for "any and every project that had to do with the [Fulton] DA's office," she "was in that meeting."  Younge further testified that "the schedule that . . . Howard had, was [her] schedule.  [She] . . . was on almost every meeting . . . that he had."  Younge also testified that she was "[p]retty much" involved "with everything

[the DA's] office did." After all, Younge was Howard's "go-to person for almost everything." Howard similarly testified that Younge was a "key member" and "high ranking part" of his staff. Accordingly, Younge had a high place in the DA's Office's chain of command, so this factor weighs in favor of applying the personal-staff exemption to Younge.

> f.      *The sixth factor, the intimacy of the working relationship, weighs in favor of applying the exemption*

The district court concluded that Younge and Howard had a close working relationship. On appeal, Younge argues that Howard ended their intimate working relationship before terminating Younge, which constituted a *de facto* demotion out of Howard's personal staff. The DA's Office argues that Younge's argument "is circular logic that would render the personal staff exception meaningless."

Younge's own testimony demonstrates that she had a close working relationship with Howard for most of her employment. When asked how often she spoke to Howard about the programs she oversaw, Younge testified, "[a]ll day every day." Howard even sent Younge messages on the weekends. Although Younge later claimed that this testimony was "obviously hyperbole," she averred that she and Howard "worked closely together, and [Howard] demanded constant availability around the clock." Howard's schedule was Younge's schedule. Younge was "literally [Howard's] go-to person for almost everything." If Howard

"needed something done[,] [Younge] would handle it." Younge was "probably one of the few on staff that was just able to just walk into [Howard's] office at any time," whereas "most folks would have to schedule an appointment or . . . request to see him through his executive assistant." Younge "had kind of an open-door access" to Howard.

Howard corroborated Younge's testimony about the pair's working relationship. Howard testified that "somebody like [Younge] wouldn't even have to knock" to enter Howard's office. Howard testified that Younge was a "high ranking part" of his staff in whom Howard "entrusted a great deal of confidence." Younge and Howard spoke about work "several times" per day. Howard also averred that he "was very involved with [Younge's] work." Accordingly, Younge and Howard had an intimate working relationship; thus, this factor weighs in favor of applying the personal-staff exemption to Younge.

In opposition to this conclusion, Younge argues that this intimate relationship ended when she announced her pregnancy. Younge contends that Howard's colder treatment of her, and the removal of her public-facing duties, constituted a *de facto* demotion out of Howard's personal staff. According to Younge, if she was personal staff before her pregnancy announcement, she was no longer personal staff between that announcement and her firing, so she can still maintain her Title VII suit based on her termination. In response to Younge's argument, the DA's Office points out that

Howard never demoted Younge and directs our attention to *Townsend v. Shook*, 323 F. App'x 245 (4th Cir. 2009).

In *Townsend*,[10] the plaintiff was Chief Deputy Sheriff and sued the Sheriff, an elected official, for violating Title VII. 323 F. App'x at 247–48. The district court granted summary judgment to the Sheriff on the plaintiff's Title VII claims after finding that the plaintiff was a member of the Sheriff's personal staff. *Id.* at 248. On appeal, the plaintiff argued, in relevant part, that "after several months in her position as Chief Deputy Sheriff, she was Chief Deputy Sheriff on paper only and that [the] Sheriff . . . relied on her more as a friend with whom he would confide personal feelings, rather than professionally, based on their respective positions." *Id.* at 250. The Fourth Circuit rejected that argument, reasoning that "such an argument, if accepted, would eliminate the exclusion to any member of any elected official's personal staff inasmuch as a loss of trust and intimacy would be the forerunner of most terminations." *Id.* (quotation omitted).

We agree with the DA's Office that the same reasoning forecloses Younge's argument. Howard never demoted Younge. After she announced her pregnancy, she remained in "the same job position, in the same department, and at the same desk." *Pierri v. Medline Indus., Inc.*, 970 F.3d 803, 808 (7th Cir. 2020). Instead,

---

[10] *Townsend*, as an unpublished opinion from a sister circuit, does not bind us. Nevertheless, the district court relied on *Townsend*, and the DA's Office has cited the case to us. As we will explain, we find the Fourth Circuit's reasoning persuasive.

Howard stopped meeting with Younge, treated her coldly, and started meeting with Younge's teams without her.[11]  Younge experienced behavior that precedes most terminations.  *See Townsend*, 323 F. App'x at 250.  Like the Fourth Circuit, we decline to elevate that behavior to an actionable demotion, lest we effectively "eliminate" the personal-staff exemption from Title VII.  *Id.* (quotation omitted).

⋆      ⋆      ⋆

In sum, five of the six *Laurie* factors weigh in favor of finding that Younge was on Howard's personal staff.  The factor concerning the elected official's hiring and firing power is neutral.  In weighing these factors, there is no genuine dispute of material fact that Younge, as Howard's Deputy Chief of Staff and Director of Policy and Programs, was on Howard's personal staff.[12]

_____

[11] These facts also materially distinguish *Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996), a case Younge relies on.  In *Cromer*, the plaintiff—a police officer—was demoted from captain to lieutenant.  88 F.3d at 1323–24.  As captain, the plaintiff was personally accountable to the sheriff (an elected official), met weekly with the sheriff, had a leading role in developing the sheriff's department policies, and dealt with the public on behalf of the sheriff.  *Id.* at 1324.  After his demotion, the plaintiff no longer helped develop department policy, was no longer supervised by or directly accountable to the sheriff, and rarely saw the sheriff.  *Id.* at 1323–24.  Younge did not face such drastic, tangible changes in her responsibilities; Howard never demoted Younge, he simply treated her more coldly before firing her.

[12] This conclusion comports with our precedent.  In *Shahar*, we observed that

> we, in our Title VII . . . jurisprudence, [have] held that assistant
> state attorneys and the like—lawyers who serve at the pleasure
> of their policy-making chief—were not employees protected

30                    Opinion of the Court                    23-11418

Accordingly, Younge was not an "employee" under Title VII, and she cannot invoke Title VII's protections. *See* 42 U.S.C. § 2000e(f); *Llampallas*, 163 F.3d at 1242. Thus, the district court did not err by granting summary judgment to the DA's Office.

### III.    Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment to the DA's Office.

**AFFIRMED.**

---

by the statutes, but were members of the personal staff of the chief lawyer: the position is one of policy-making level, involving one who necessarily advises, and acts upon, the exercise of constitutional and legal powers of the chief's office.

114 F.3d at 1104 n.15.